## JIM WILSON v. STATE.

No. A—3412.    Opinion Filed Sept. 8, 1919.

(183 Pac. 613.)

(Syllabus.)

1. **JURY—Challenge to Panel—Specification of Objection.** A challenge to a panel of jurors. summoned upon an open venire. on the ground "of a material department from the forms prescribed by law in respect to the selection, drawing, and return of said panel, from which the defendant has suffered material prejudice, and that said panel of jurors is not a fair and impartial panel," was properly denied, because it did not specify the facts, if any, showing how or in what manner the panel was not summoned as prescribed by law.

2. **SAME—Statutory Form.** Under section 5843, Rev. Laws 1910, a challenge to the panel must be taken before the jury is sworn, and must be in writing, specifying plainly and distinctly the facts constituting the grounds of challenge.

3. **SAME—Bias of Officer.** Under section 5848, Rev. Laws 1910, a challenge to a panel of jurors summoned upon an open venire, on account of any bias of the officer who summoned them, must

be made in the same form, and determined in the same manner as if made to a juror.

**4.    EVIDENCE—"Confession."**   In criminal law a confession is a voluntary statement made by a person charged with the commission of a crime, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act, or the share and participation which he had in it.

**5.    SAME—"Confession"—Scope.**   A "confession," in a legal sense, is restricted to an acknowledgment of guilt made by a person after an offense has been committed, and does not apply to a mere statement or declaration of an independant fact from which such guilt may be inferred.

**6.    SAME—Voluntary Confession—Admissibility.**   A statement, declaration, or admission made by one accused of crime, explaining suspicious circumstances for his own defense, from which the jury may or may not infer guilt, is not a confession, and does not come within the rule that confessions must be voluntary to to be admissible.

**7.    EVIDENCE—Explanation of Incriminating Circumstances—Contradiction.**   Statements of a person accused of murder, in giving an account of himself, or of the homicide, which tend to explain incriminating circumstances brought against him, are admissible, and may be proved false by the prosecution after it has proved that accused made them.

**8.    APPEAL AND ERROR—Reversible Error—Statute.** Under Code of Criminal Procedure (sec. 6005, Rev. Laws 1910), providing that no judgment shall be set aside or new trial granted on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to errors in any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right, this court is necessarily vested with a large discretion in determining the effect of errors, and each case must depend upon its own circumstances, since it is the opinion of the court, upon a full consideration of the particular record, including the evidence, that is to control upon the question whether the error complained of has resulted in a miscarriage of justice.

**9.    APPEAL AND ERROR—Improper Remark by Court—Reversible Error.**   An improper remark by the court while ruling on an objection to the testimony of a witness for defendant, which was in effect a comment on the weight of the evidence, is not ground

for reversal where the court subsequently instructs the jury to disregard the same, and where this court, from an examination of the whole case, finds that the proof of defendant's guilt is practically undisputed.

Conceding that some of the rulings of the trial court were erroneous, they affect no substantial right of the defendant, and

10. **APPEAL AND ERROR—Harmless Error—Rulings of Trial Court.** under section 6005, Code of Criminal Procedure (Rev. Laws 1910), they must be regarded as technical, and insufficient to warrant a reversal of the judgment of conviction.

11. **HOMICIDE—Sufficiency of Evidence—Sentence.** The evidence in a homicide case examined, and **held** sufficient to warrant a verdict convicting the defendant of murder, but insufficient to warrant the extreme penalty of the law, and the judgment and sentence is modified to imprisonment for life at hard labor.

*Appeal from District Court, Carter County;*

*W. F. Freeman, Judge.*

Jim Wilson was convicted of murder and appeals. Modified and affirmed.

*John L. Hodge,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J.   This is an appeal from a conviction of murder and judgment and sentence of death.   The information charged that Jim Wilson did, in Carter county, on or about the 2d day of April, 1918, kill and murder one Oscar Kyle by striking and beating him on the head with an iron bolt, thereby inflicting a mortal wound.   On May 24, 1918, in pursuance of the verdict of the jury, he was sentenced to suffer death by electrocution as provided by law.

On behalf of plaintiff in error it is argued that the evidence does not justify the verdict rendered, and that er-

rors were committed upon the trial which require a reversal of the judgment and the ordering of a new trial.

The foundation of the case against defendant rests in his admissions to certain persons and his so-called "confession," testified to by the arresting officers as having been made to them within 24 hours of the homicide.

Defendant did not testify in the presence of the jury, as a witness in his own behalf, but offered testimony relative to threats against him made by the deceased, and testimony showing the finding of a knife and stick on the scene of the homicide the following morning, and submitted his case on the theory of self-defense.

The first alleged error is in overruling defendant's motion for a continuance.

The case came on for trial on May 20th, and defendant filed his verified motion for a continuance on the ground of the absence of Oscar Vestal, a material witness. In defendant's affidavit he states:

"The said Oscar Vestal, if present, would swear that the deceased, Oscar Kyle, tried to get him, the said Vestal, to decoy the defendant, Jim Wilson, off to what is commonly called the 'Reservation,' the same being a resort for the purpose of prostitution in and near the city of Ardmore, and give him, the said Kyle, an opportunity to kill said defendant; that he conveyed this intelligence to said defendant; that affiant believes said evidence to be true, and that the same cannot be furnished by no other witness; that on the 6th day of May he caused a subpoena to issue for Oscar Vestal; a copy of the subpoena, with the return thereon, is attached to, and made a part of, the application. The return is as follows: 'Received this writ this 6th day of May. I cannot find the within named Oscar Vestal within my county. Hugh Brown, Sheriff.' The subpoena and

return was filed with the court clerk on the 9th day of May. Affiant further states that his attorney examined said return after the same filed, and thought the said Oscar Vestal had been duly served, and continued so to think until the witnesses in the case were called and the said Oscar Vestal did not appear."

The motion for continuance was properly denied on the showing made, for want of due diligence.

The second assignment of error is that the court erred in overruling defendant's challenge to the jury panel.

The record shows that after the jury had been selected, but before being sworn to try the case, the defendant filed a challenge as follows:

"Comes now Jim Wilson, defendant in the above-entitled cause, and presents this his challenge to the panel of the jury for material departure of the forms prescribed by law in respect to the selection, drawing, and returning of said panel, from which defendant has suffered material prejudice, and alleges that, although the court directed the sheriff to summon talesmen from the body of the county, the talesmen actually summoned and returned for said panel were nearly all from the city of Ardmore; that, of the panel of sixty-two jurors who appeared for examination touching their qualifications to sit in said cause, fifty-one of the number actually resided in the city of Ardmore, the very scene of the alleged murder. Wherefore defendant charges that said panel of jurors is not a fair and impartial panel, which the law guarantees in such cases; and therefore prays the court that his challenge to said panel be allowed, and said jury be discharged as to this case.

"The court: I presume there will be no dispute on the venire summoned of the proportion that reside in Ardmore.

"The County Attorney: The court will presume that the sheriff made no discrimination and summoned these tales-

men from the citizenship of the county as he found them. In addition to this, the court has carefully excused every man summoned in this case who admitted that he had any kind of impression touching the guilt or innocence of this defendant.

"The Court: The challenge is overruled."

Our Code of Criminal Procedure provides that a challenge to the panel can be founded only on a material departure from the forms prescribed by law, from which the defendant has suffered material prejudice. Section 5842, Rev. Laws 1910.

And that "a challenge to the panel must be taken before a jury is sworn, and must be in writing, specifying plainly and distinctly the facts constituting the ground of challenge." Section 5843, Rev. Laws 1910.

So far as the record shows, the procedure in impaneling the jury was in the manner prescribed by law, and there is nothing to show that defendant exhausted his peremptory challenges, or that an objectionable juror was forced upon him.

Our Code further provides:

"When the panel is formed from persons whose names are not drawn as jurors, a challenge may be taken to the panel on account of any bias of the officer who summoned them, which would be good ground of challenge to a juror. Such challenge must be made in the same form, and determined in the same manner as if made to a juror." Section 5848, Rev. Laws 1910.

The record discloses that the challenge to the panel was not founded on the bias of the officer who summoned them. The challenge was properly denied because it stated a mere conclusion, and no fact showing how or in what manner the

venire was illegally selected. The mere unsupported assertion that the panel of jurors is not fair and impartial was not sufficient to warrant the court in discharging the jury.

The fourth assignment is that the court erred in admitting, over the objections of defendant, irrelevant, incompetent, and immaterial testimony, all of which was prejudicial to the rights of this defendant.

It appears that numerous objections were made, and exceptions taken, during the course of the trial to the admission of evidence bearing upon the issues in the case.

Several errors are assigned on the admission of defendant's alleged confessions and admissions, on the ground that the same were not voluntarily made.

It appears from the record that sufficient proof of the *corpus delicti* was made to justify the admission of a confession.

It appears from the evidence that Oscar Kyle, the deceased, and defendant, Wilson, were both laboring men, and resided in the city of Ardmore. Defendant had been employed as car inspector for about a year in the Santa Fe yards of said city. The deceased had a family, consisting of a wife and three small children. Defendant was a single man, boarding and rooming at the time with the deceased and his family. About 9 o'clock on the night of April 2, 1918, the deceased was found between the depot and the roundhouse of the Ringling Railroad lying between the main track and the north siding, near "H" street, in the city of Ardmore, in an unconscious and dying condition. He had several wounds about the head and face, and remained unconscious until his death, five or six hours later.

Harvey Lee and defendant, Wilson, were arrested the next morning, and both stated to the officers that they were out to Whitington Park with two women from 8 until 11 o'clock the evening before. The last time the deceased was seen before the assault was about 8 o'clock that evening, when he was seen talking with defendant near the Santa Fe station.

L. T. Evans testified:

That he was car inspector for the Santa Fe Railway, working with defendant; that the morning following the homicide they were working together, "and I said, 'Jim, what in the world you reckon that fellow was doing out there last night to get killed with a train?' He says, 'The train didn't kill him.' I says, 'What the devil done it then?' He says, 'Somebody beat him to death, somebody hit him all about the head, the back of the head, the front of the head, and in the mouth with a bolt with the head on it.' I asked him how he knew they hit him with a bolt with the head on it. He said, 'There was the print of it.' Pretty soon he looked up and saw an automobile coming, and says, 'There comes the law; I believe they are after me'."

Sheriff Garrett, Policeman Chancellor, and another man were in the automobile. They stopped and arrested him.

The alleged confession of the defendant was made to the sheriff, Buck Garrett. Sherriff Garrett testified:

"I was looking for defendant, and went through the Santa Fe yards, met him, and said, 'Jim, I will have to hold you for an investigation for this killing.' He replied, 'All right, Buck; I can prove where I was last night.' We went to the county attorney's office, and there he stated, in the presence of Jim Chancellor and Jim Dustin, that he was at Whitington Park the night before from 8 until 11 o'clock; that Harvey Lee and a couple of girls were with him, and he

left them and came to town to get some tobacco; that one of the women was Mrs. Ruby Rutledge. I locked him up in jail, and talked with Harvey Lee, and then went and talked with Mrs. Ruby Rutledge and Mrs. Britton. Then I went back to the jail, and again talked with Harvey Lee. I then had a talk with defendant, and told him what Mrs. Britton and Mrs. Rutledge had said. The defendant's statement to me was voluntary, absolutely. I said, 'Jim, somebody has lied about this; you might as well tell me about it.' He said, 'If I tell you about it you will go on the witness stand and swear it.' I says, 'Sure I would, whether it was for or against you; I would have to do that.' He said he had gotten with Harvey Lee and went to Oscar Kyle's house, and they came up to the Penington grocery, and stopped there a while, and went up to the Santa Fe station; that Lee told him that he had an appointment with some girls in South Ardmore; that he went up Main street and met Oscar Kyle up there. That Oscar asked him, 'What are you doing?' and he said, 'Loafing around,' and Oscar said, 'I got a date with a couple of girls out in the West Ardmore; come and go with me.' He told him, 'All right;' and they started, and he described the place where Kyle was found. He said he asked Kyle, 'Where are those girls?' and Kyle said, 'Do you know where the tank is beyond the roundhouse?' and he said, 'Yes;' and Kyle said 'They are there.' He said, 'I am not going out there,' and Kyle says, 'The hell you ain't; what is the matter with you?' and Kyle made at him with something bright in one hand and a stick in the other, and Kyle hit him, and he struck Kyle about three times. I asked him, 'Jim, what did you hit Kyle with?' He said, 'An iron bolt; I can't tell you, but I can show you.' Then with Jim Chancellor, and defendant, I drove out there, and defend-and got out of the car, looked around, and picked up an iron bolt and said, 'Here it is.' That he examined it, and there was blood on one corner of the bolt, and some hair was on the end of the tap. Witness produced a bolt fifteen inches long and one inch in diameter.

"Cross-Examination: Q. I will ask you if you didn't tell him at that time, 'You had just as well sit down and tell me,

maybe I can help you out.' A. I did not. I says, 'Jim, you had better tell me about this.' He says, 'If I do, you will go on the stand and swear it.' I says, 'Certainly I would, whether it is for or against you.' Q. Didn't you tell him at that time that you would be a help to him? A. No; I didn't at that time. After the conversation was over I says, 'Jim, I am sorry for you; I hope I can do something for you.' Q. Have you in your possession the knife and stick found near the scene of the homicide? A. I have a knife and stick that is said to have been found there. Q. Who turned them over? A. Mr. Price, a policeman for the Ringling Company, gave them to me."

Jim Chancellor testified that there was no promise made nor threat used to extort the confession, and defendant's going to the scene of the tragedy was at his own request and a voluntary act on his part.

On request of counsel for defendant the court directed the jury to retire. Thereupon defendant, as a witness in his own behalf, testified, in substance, as follows:

" When the sheriff arrested me he told me he was holding me pending an investigation of this killing. The county attorney, Jim Dustin, and Jim Chancellor were present. Harvey Lee was arrested also. Sheriff Garrett put me in the south room, upstairs. A little later he came in there and said somebody had lied about it in the statements that Harvey Lee and I had made and these women. He said, 'Harvey Lee had changed his statement, and I might as well tell the truth; that it looked like that it was a framed-up piece of business.' I told him that I would like to have my uncle from Ft. Worth, who is a lawyer, and one from McKinney phoned for. He said he would put in a telegram for him and I might as well go ahead and tell the truth about it at that time; that he would keep the telegram in and get my uncle." He was then asked: "What caused you to make any statement? A. I thought from what he said and everything that he was a friend of mine and would help me as he said he would. He had favored me in the case before.

Q.   Did you up to that time want to make any statement at
all?    A. No, sir;   I did not want to make any statement
at all until I had seen an attorney.   Q. You were placed in
jail before that as a result of an Indian being killed down
here on the track?   (Objection sustained.)"

The admissibility of a confession, where it is challenged,
is a question for the trial court.   The court must decide, in
the first instance, whether the evidence of the *corpus delicti*
is *prima facie* sufficient to permit evidence of a confession
to go to the jury, and it is for the trial court to determine
whether the confession was voluntarily made and is there-
fore admissible as evidence.

In *Berry v. State,* 4 Okla. Cr. 202, 111 Pac. 676, 31 L.
R. A. (N. S.) 849, it is said:

"Primarily there are two facts which render a confes-
sion inadmissible: First, that it was obtained under any form
of compulsion, so that to receive it in evidence would violate
the defendant's constitutional privilege   against   self-in-
crimination; and, second, that it was made under such
circumstances of hope or fear as to create a fair probability
of its testimonial untrustworthiness; and while the greater
number of cases hold the contrary, yet we think the proper
rule is that, in the absence of a   statute   governing   the
matter, *prima facie* any confession is admissible in evidence;
and, where its admissibility is challenged by the defendant,
the burden is on him to show that it was procured by such
means or under such circumstances as to bring it within
one of the other of the conditions, stated, unless there is
something in the confession itself or the other evidence on
the part of the state which shows that it is inadmissible."

And Prof. Wigmore says that this is the practical and
natural rule, "for, if there is any reason to object to the con-
fession, no one can know it better than the defendant." He
says further:

"Looking at the general principles of admissibility and the comparative rarity of untrustworthy confessions, as well as the contingent nature of the dangers supposed to flow from improper inducements, the more practical rule would be to receive confessions without question, unless they are shown to have been improperly induced, especially since a contrary rule may involve the difficulty of proving a negative." Wigmore on Evience, vol. 1, sec. 360.

In *Anderson v. State*, 8 Okla. Cr. 90, 126 Pac. 840, Ann. Cas. 1914C, 314, it is held:

"The fact that a prisoner may be under arrest and in jail and was not warned that any statement made by him might be used against him, will not in any manner affect the admissibility of any voluntary statement made by him which would otherwise be competent."

His counsel contends that defendant's statements as made to the officers were confessions induced by some hope or promise of a benefit, and were therefore not voluntary.

Upon a careful examination, we think it sufficiently appears that defendant's admissions and declarations were properly admitted. The mere fact that defendant testified that he made the statements because he thought that the sheriff was his friend and would help him did not overcome the *prima facie* case and the testimony of the officers. All safeguards thrown around confessions by the law are to insure the truth, and it is not disputed that the defendant's alleged confession was true, and he did not offer himself as a witness, or any other testimony before the jury to show that his statements had been obtained by duress, inducement, or undue persuasion. We are inclined to think, also, that the admissibility of defendant's statements does not depend upon the fact that they were voluntary. Strictly construed, instead of being confessions of guilt of the crime charg-

ed, they are explanations of incriminating circumstances against defendant.

In criminal law a confession is a voluntary statement made by a person charged with the commission of a crime communicated to another person, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act, or the share and participation which he had in it. See Black, Law Dict.

In the case of *State v. Reinhart,* 26 Or. 466, 38 Pac. 822, it was said:

"A 'confession,' in a legal sense, is restricted to an acknowledgment of guilt made by a person after an offense has been committed, and does not apply to a mere statement or declaration of an independent fact from which such guilt may be inferred."

In *State v. Campbell,* 73 Kan. 688, 85 Pac. 784, 9 L. R. A. (N. S.) 533, 9 Ann. Cas. 1203, it was said:

"Voluntary statements of fact made by a defendant in a criminal action, which do not tend to establish his guilt, but which are exculpatory in their nature, are competent evidence against him as admissions of a party."

Abbott in his Criminal Trial Brief, sec. 481, says:

"A declaration made by one accused of crime, denying any criminal act, and explaining suspicious circumstances for his own defense, is not a confession, and does not come within the rule that confessions must be voluntary to be admissible."

And again (section 513) the author says:

"Evidence of falsehood on the part of the accused in giving an account of himself, or of the transaction, or his relation to it, is competent as affording legitimate presumption of guilt. For this purpose the prosecution may

prove such declarations of the accused, and then prove their falsity."

In *State v. Royce*, 38 Wash. 111, 80 Pac. 268, 3 Ann. Cas. 351, it was said:

"In a criminal prosecution statements made by the accused to police officers before he had been charged with any crime, and not resulting from threats made or inducements held out by the officers, are admissible in evidence."

A statement, declaration, or admission made by one accused of crime, explaining suspicious circumstances, for his own defense, from which the jury may or may not infer guilt, is not a confession, and does not come within the rule that confessions must be voluntary to be admissible. It would appear that defendant's purpose in all his statements was not to inculpate himself, but exculpate himself. He made the statements, not for the purpose of conceding that he was guilty of murder, or with any view to confess his guilt, but in the line of denial of guilt—not an express, but an implied denial. His statements constituted the basis of the defense made.

Several witnesses testified that the deceased had made threats against defendant's life. The only evidence tending to show an overt act on the part of the deceased is defendant's statements. Without this evidence the testimony tending to show that the deceased had made threats against the defendant's life was inadmissible.

It follows that defendant's statements to the officers were properly admitted.

Objection was taken to a question and the answer of Mrs. Kyle, the first witness for the state, upon her redirect examination. On her cross-examination she was asked and

against the objections of the county attorney testified that her husband often abused her, and that defendant at such times would interfere to prevent it, and for this reason her husband had several times threatened to kill him, and at one time assaulted him with a knife; that on April 2nd, after supper, she heard her husband say that he would kill some one who said something about his questionnaire, and from what he said she knew he meant Jim Wilson.

Her redirect examination was as follows:

"Q. You say this trouble was over Mr. Kyle's questionnaire? A. Yes, sir.

"Q. Isn't it a fact that at the time your husband had a controversy with this defendant in your presence and accused this defendant of going before the board and putting him in class 1? A. My husband said that Mr. Wilson had tried to get him in class 1.

"Q. Isn't it a fact when this defendant was away from here if you and him didn't have long-distant telephone calls? A. No, sir; I didn't. Two parties told me about that, and it was a falsehood.

"Q. At the time you heard about this long-distance call where was the defendant? A. At McAlester, I reckon.

"Q. What was he doing? A. In the penitentiary, I suppose.

"Mr. Hodge, Counsel for the defendant: We object to that.

"The Court: That is not a part of the proof in this case; gentlemen of the jury, you will disregard it. You cannot assail the character of the defendant until he puts it in issue; you will disregard all that."

The testimony having been invited by improper cross-examination, and having been properly withdrawn, it affords no grounds for a new trial.

The next serious contention is that certain remarks of the court during the progress of the trial and in the presence of the jury prevented a fair and impartial trial.

It appears that when L. T. Price, a witness for the defendant, was on the stand the following proceedings were had:

"Q. State whether there upon the scene of the homicide any weapons were found.

"The County Attorney: Objected to as incompetent, irrelevant, and immaterial.

"The Court: What time was this—how long after the homicide?

"The County Attorney: From 10 o'clock one evening until 10 the next morning.

"The Court: Other witnesses have testified about going upon the scene and making an investigation. The objection is sustained.

"Mr. Hodge: Save our exception. Does the court rule that we can't show that weapons were found there at the time this man visited the scene of the homicide, 10 o'clock the next day?

"The Court: I withdraw the ruling so far as finding weapons are concerned.

"A. Well, there was a piece of broomstick there and a knife.

"The Court: Did you find that stuff then?

"A. Well; no, sir.

"The County Attorney: We object and ask that his testimony be excluded.

"By Mr. Hodge: Did you see that weapon picked up there?

"A. Well, now, I can't tell you.

"The Court: That is 9 o'clock the next day, after several have testified about going on the ground. I am going to sustain the objection. Several witnesses have testified about going on the ground where these things were supposed to have been found, and failed to find anything before this man was there.

"Mr. Hodge: We save an exception to the ruling and the remarks of the court relative to what other witnesses have testified concerning any searches made.

"The jury are the sole judges of the testimony, if there is such testimony, you know whether there is or not."

Pender Standfield, a witness for the defendant, testified he was upon the scene of the homicide about 10 o'clock the next day, and was asked:

"Q. Did you see any weapons picked up there on the scene of the homicide at the time?

"The County Attorney: Same objection.

"The Court: Is that the weapons you were asking about a while ago?

"Mr. Hodge: Yes, sir.

"The Court: The objection is sustained.

"Mr. Hodge: Save us an exception.

"The Court: I am going to withdraw that ruling, you let the testimony in, and give the defendant the benefit of the doubt."

Thereupon the witness Price was recalled, and asked to state if he saw these weapons picked up:

"The Court: I think I should explain to the jury when this question was asked a while ago the court sustained the objection of the state; after a further consideration of the

matter, the court withdraws his ruling, and now permits this testimony."

Witness Price then testified that when he was there a negro told him that he had picked up the knife and stick.

Witness Standfield, recalled, testified that he was present when Tom McKinney picked up a knife and a stick there.

Tom McKinney testified that the next morning about 10 o'clock he picked up the knife and the stick about 30 feet from where the killing occurred.

Obviously, the first objection interposed was properly sustained. However, the remarks of the court were wholly improper and uncalled for. It was for the court to pass upon the admissibility of the testimony, but it was exclusively the province of the jury to pass upon the credibility of the evidence adduced, uninfluenced by the trial court as to its weight or credibility. The remark of the court that "several witnesses have testified about going on the ground where these things are supposed to have been found, and failed to find anything, before this man was there," was clearly a comment on the weight of the evidence. The court attempted to correct the error by observing, "The jury are the sole judges of the testimony; if there is such testimony, you know whether there is or not;" and by giving the following instructions, "You are the sole judges of the facts proven, the weight and value of the evidence, and of the credibility of the witnesses." There is no question about the fact that defendant killed the deceased and the evidence abundantly sustains the verdict finding defendant guilty of murder. This being so, ought we to set aside the judgment and grant a new trial merely for this remark? Our Code of Procedure Criminal (section 6005,

Rev. Laws 1910) provides no judgment shall be set aside or new trial granted on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

By this provision this court is forbidden to reverse a judgment of conviction for error, unless, after an examination of the entire record, it is of the opinion that the error has probably resulted in a miscarriage of justice. It thus makes it the duty of this court in considering the questions of law presented to examine the entire record, including the evidence. It follows that this court is necessarily vested with a large discretion in determining the effect of errors, and each case must depend upon its own circumstances, since it is the opinion of the court, upon a full consideration of the particular record, including the evidence, that is to control upon the question whether the error complained of has resulted in a miscarriage of justice.

There is no question about the fact that defendant killed the deceased, and the evidence of deliberation and premeditation, independently of the undisputed facts and circumstances, shows that on the evening of the tragedy defendant met witness Crowley near the Busy-Bee restaurant, and said to him, "I know where we can get a hundred dollars by killing a son of a bitch," and Crowley said, "Couldn't we get the money any other way"; and defendant said, "No, I would not undertake it any other way without killing him." Crowley said, "Who is it?" Defendant said,

"I won't call any names; he is a working son of a bitch who always carries a hundred."

That the killing was deliberate is established by the evidence beyond a doubt, and, upon the evidence, it seems to us that the conviction was at all events inevitable. After a most careful examination of the record we are satisfied that the remarks of the judge did not constitute error requiring a reversal of the case.

Another assignment is that the court erred in the instruction given. The charge of the court submitted the issues of murder and of manslaughter in the first degree and the law of self-defense. The instructions of the court, while not strictly correct, when considered as a whole were as favorable to defendant as he had any right to demand.

The ninth instruction, which was excepted to, is as follows:

"Evidence has been admitted to prove that on various and sundry occasions prior to the killing the deceased had made threats upon the life of the defendant herein. In this connection you are told that bare threats made by the deceased, either communicated or uncommunicated, will not mitigate a homicide; and such proof cannot be considered by you as justifying the killing on the part of the defendant, unless the threats themselves were accompanied by some overt act or demonstration on the part of the deceased which furnished the defendant reasonable cause to believe that he was in danger of being killed or of receiving great bodily injury at the hands of the deceased.'

It is objected to this instruction that by it the jury are told that the act or demonstration must have furnished defendant reasonable grounds to apprehend danger, thereby depriving him of the benefit of the circumstances as they reasonably appeared to him, and that the jury likely got

the idea from the language used that a threat without an act was not to be considered. The instruction, to be technically correct, should have read, "unless at the time of the homicide there was some overt act or demonstration."

This court has often held it is sufficient if the instructions, taken as a whole, substantially present the law of the case fairly. Absolute correctness of proceeding cannot be obtained, even in our very best courts, and a defendant cannot be heard to complain if an error is committed that cannot operate to his prejudice.

Another assignment is that the prosecuting attorney, in his argument to the jury, made use of inflammatory language while referring to the defendant and which was entirely unwarranted by the evidence.

The alleged objectionable remarks are not properly shown by the record. However, it appears that counsel for defendant in the course of the opening argument interposed an objection. The prosecuting attorney replied:

"If the court please, I want this in the record to show the state's theory of this case, of how this occurred, that this is the most cruel murder I ever asked twelve men to pass upon. These are my remarks."

The remarks of counsel must be considered and construed in reference to the evidence, and we think the remarks complained of are not of such character to raise the presumption that defendant was prejudiced in any degree.

Upon a very careful examination, both as to the law and the evidence, we have failed to discover anything that would warrant a reversal of the case.

There only remains the question as to whether the judgment should be modified by this court.

One of the grounds in the motion for a new trial and assigned as error is: "The penalty assessed by the verdict of the jury, in its severity, is not justified by the evidence and the law."

Under the following provisions of the Penal Code the punishment to be inflicted for the crime of murder is left to the determination of the jury:

"Any person convicted of murder may suffer death, or imprisonment at hard labor in the state penitentiary for life, at the discretion of the jury." Section 2319, Rev. Laws 1910.

When the death penalty is assessed the trial court is without power or authority to render judgment and sentence except in accordance with the verdict. *Owen v. State,* 13 Okla. Cr. 195, 163 Pac. 548.

It is provided in the Code of Criminal Procedure that "the appellate court may reverse, affirm or modify the judgment appealed from." Section 6003, Rev. Laws 1910.

By this provision it seems to have been the intention of the Legislature to vest this court with power to modify the judgment, when such a course would be in furtherance of justice and conduce to the humane administration of the law. In a capital case it is the duty of this court to examine, with the greatest care, the whole record in favor of life, and review the case upon the merits to determine whether justice requires a modification of the judgment to imprisonment for life.

In this case the fact that the open venire was summoned by an officer who was one of the main witnesses in the case should be considered, although no proper objection was made or exception taken.

In *Koontz v. State*, 10 Okla. Cr. 553, 159 Pac. 842, Ann. Cas. 1916A, 689, it is said:

"It is essential to the fair and impartial administration of justice that an open or special venire should be summoned by an officer who is not disqualified by reason of interest, bias, or prejudice."

And while there is nothing to show that defendant exhausted his peremptory challenges, or that an objectionable juror was forced upon him, yet we are unable to disabuse our minds of the conviction that, all the circumstances being considered, defendant may have been seriously prejudiced. We are also inclined to think that the evidence is insufficient to warrant the extreme penalty of the law. For these reasons we are of opinion that justice requires a modification of the judgment and sentence of death to that of imprisonment at hard labor in the penitentiary for life.

The judgment of the district court of Carter county herein is so modified; as thus modified, the judgment is affirmed.

ARMSTRONG and MATSON, JJ., concur.