## ALFRED ROWAN v. STATE.

No. A-8889.   July 19, 1935.

Rehearing Denied Aug. 9, 1935.

(49 Pac. [2d] 791.)

348

354

Jack Southerland, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). Plaintiff in error, Alfred Rowan, was convicted in the district court of Jackson county of murder, and the death penalty assessed, upon an information charging him with the murder of Roy D. Gentry in said county on November 5, 1934. His motion for a new trial having been overruled and sentence of death having been pronounced upon him, the judgment and sentence has been brought to this court for review. The errors assigned and argued are as follows:

First. That there was error in overruling the defendant's motion to suppress a certain confession.

Second. That the court erred in giving certain instructions.

Third. That the punishment is excessive and appears to be the result of passion and prejudice.

The plaintiff in error, a negro, had been working for Roy Laney 6 miles southwest of Frederick, and 4 weeks before the homicide had, with his wife, moved to the home of his wife's parents in the city of Altus. He was arrested at Wichita Falls, Tex., in the afternoon of the 8th day of November.

F. M. Dowdy testified:

"I am a city detective of Wichita Falls. I first saw the defendant, Alfred Rowan, about two miles north with two other negroes. Officer Hanaway was with me. We drove up to them and I searched this boy here and asked him what his name was. He said 'George Williams.' I asked him where he came from. He said 'Grandfield.' I asked him again what his name was. He said 'Jake Wilson.' I found a knife commonly called 'East Dallas Special' in his overalls pocket. I placed him under arrest and brought him to the station. The knife was admitted in evidence. I was present when he was questioned by Geo. H. Hodgins, Chief of Police."

Geo. H. Hodgins testified:

"I am chief of police of Wichita Falls. The defendant was brought to the station a little after 3 o'clock. Later I questioned him. Lee Carter, deputy sheriff of Archer county, was present."

Objection was made and the court directed the jury to retire. Thereupon counsel hands witness two sheets of paper, purporting to be the confession of one Alfred Rowan. Witness testified:

"This statement, Judge, wasn't made to me; it was

made to Mike Anglin, our assistant district attorney. I was present when it was made and when I asked him if he had killed Roy Gentry, he said he did. The statement was made freely and voluntarily on the part of the defendant."

On cross-examination, he stated:

"After obtaining the confession from him, like I do in all cases, of which I have had many, I asked him if he was then ready to make a confession in writing. I was present at all times during the questioning and I did not use any force on this defendant."

Jimmie Gonzella, superintendent of the bureau of identification, testified:

"I did not use any threats on him and I did not tell him I was going to turn him over to the mob."

The defendant testified:

"My name is Alfred Rowan. I was arrested about 3 o'clock. They carried me to the chief's office first, stripped my clothes, then gave me another pair of overalls to put on. They took my finger prints and picture. I denied my name to the Mexican fellow. He said I was going to get mobbed and I got scared. They wanted me to make my confession. They carried me upstairs and put me in a cell with three more boys. I was up there about an hour. They come back and got me. There was a whole lot of them there. Mr. Dowdy, Mr. Hanaway, and another man that cussed me and drew a pistol on me, then they took me to Chief Hodgins' office. They sat around there and talked to me. Asked me 'what you going to do.' I told them I didn't know. They said 'you gotta do something.' I said 'yes, sir.' He said 'I want you to tell.' I said 'I don't know what to tell you.' They said 'yes you do and your going to tell' and they got to telling me that my wife 'done got killed.' I up and told them, told them the truth about it and they wasn't satisfied with that, and the Chief, he went out; then a fellow with gold in his teeth called me some names and said 'your going to tell me or we're going to

kill you; we aint got no patience with negroes no how.' I said 'yes, sir, I know that's so,' then the Mexican fellow struck me with a pistol. I signed it. They say it was about 12 oclock, then I was brought over to Granite."

After hearing the evidence the court held the alleged confession admissible. The jury was returned into court.

Chief Hodgins testified and identified the paper purporting to be the confession of Alfred Rowan, the defendant, and stated:

"I was present when the defendant signed this confession. I asked him if he killed Roy Gentry, he said he did so we called Mike Anglin, district attorney of Wichita county. I told him that Alfred Rowan wanted to make a confession as to the murder that he had committed and he said he would be glad to take it. I introduced him to Mr. Anglin and Mike asked him if he was ready to talk and he said he was. After the statement was prepared, the defendant read this statement aloud to all persons present before he signed it. He was asked to do that by Mr. Anglin and was then asked, 'Is that a true statement?' His answer was 'it is and I will sign it' and he did sign it in my presence and in the presence of D. R. Rutherford, prosecuting attorney, and O. R. Jones, undersheriff of Jackson county."

O. R. Jones testified he is deputy sheriff of Jackson county and on a call went immediately to Wichita Falls and was present when the defendant read his confession, after it was written; that there was no force or threats of any nature made on the defendant to obtain this confession; that he saw the defendant sign it, and witnessed his signature.

Thereupon the confession was read to the court and jury as follows:

358

"State's Exhibit C

'The State of Texas, County of Wichita.

"Date November 8th, 1934

"To Whom it May Concern:

"After I have been duly warned by Mike Anglin that I do not have to make any statement at all, and that any statement I may make may be used in evidence against me on the trial for the offense concerning which this statement is herein made, I wish to make the following voluntary statement to the aforesaid person:

"My name is Alfred Rowan. My address is Frederick, Okla. I am 29 years old. Last Saturday night Pinkie Leonard and I went in Roy Laney's house and stole four guns. We hid those guns out that night, moved them Sunday and Monday I took them and went to Altus. Pinkie did not go with me to Altus. At Altus I pawned the 410 gauge shotgun to some dark complected fellow that looked like a Jew. He first offered me five dollars on the gun then he said 'that is the way it is with you crap shooters, get broke and bring me your stuff, then you don't come and spend anything with me.' I told him I did not even live there. Then he said, 'I guess the gun is stolen then.' I told him it was, so he put a dollar down and told me I could take the dollar or go to jail. I took the dollar. I was going to catch a freight out of there, and was going down the railroad tracks. I sat down to rest. I was mad and discouraged. Mad at the white man that I had soaked the gun to, and discouraged because I was out of work. While I was sitting there, a white man came by and asked me where I was going. I told him 'it's none of your damn business.' He said 'Don't get smart with me or I'll kick your G—— D—— Ass.' I said 'that's alright I will go on. If I hurt you, they will kill me, but if you hurt me they won't do nothing about it.' His wife called him then so I went on a little further and sat down again. Pretty soon this same man came on down where I was and said 'I'll knock your G—— D—— brains out, you black son of a bitch' and threw a brick at me. I told him I would 'get him' and he

said 'alright, anytime you want me, I live right there' and pointed out a house which was right there by the tracks where I had seen this woman come out and call him. This was just about sundown and a little before dark. I went on down the tracks a little ways and sat down. I was mad. I was mad at him and mad at the pawnbroker. I sat there a while I don't know just how long, but I do remember that there was a train just fixing to pull out. I decided to go to this fellow's house and whip him. I went up to the house and it was lighted up I think with one lamp. I knocked and no one answered, I knocked again and said 'hello.' The man answered and I walked in. I had a pump shotgun with me, so when I walked in I could see the man lying in bed and the woman sitting on the side of the bed. He asked me what I wanted and I said 'I have come to settle it with you. I am going to kill you.' He said, 'put your gun down and let's cut it out.' I told him that I would not for that would give him too much advantage. He raised up out of bed and I shot him. He got out of bed and grabbed my gun and I broke to run. I thought he had a knife. He caught me and we started tussling, so I pulled my knife and opened it with one hand and my teeth and started cutting him. I finally threw him down and jumped out a window. I do not know if the window was up or down, but I jumped out of it and ran. I got my guns and started out across a field. I finally came to a house that had a windmill and washed my head at the tin water tank. I was very thirsty and bleeding. I drank a lot of water there. After leaving there I came to a branch later that night and drank a lot more water. I walked across fields and plowed ground until I got to the river. I had on a imitation leather jacket fleece lined. I left that at the tank where I got water and washed my head. I also had a red sweater but I do not know where I left that, but I pulled it off and threw it down before I got to Tipton. At Tipton I stayed in Fred Coulter's barn. Near there I got a jumper from some colored folks. After getting the jumper I went across a field to a hay stack and changed my clothes. I left my shirt

and underwear there. They were bloody. Later on during the day I pulled the heels from my shoes and threw them away. This was in a pasture in the same section where the haystack was.

"I went by my home and got a coat, cap and underwear from my wife. My mother-in-law and father-in-law were there. They both saw me and saw me getting this clothing. I went from my home on down to Burks Spur and left the jumper in a box car there. From there I went to Hollister and spent the night in the railroad station, that is part of the time in the station and part of the time in an old barn. The next morning I went on to Grandfield and caught a train there for Wichita Falls. Just after I got off the train here in Wichita Falls I was arrested.

"When I went in that man's house, it was my intention to kill him or get killed. That is the reason I told him I was going to kill him. I did that because I was mad at him. He was the same man that threw the brick at me that afternoon.

"[Signed]   Alfred Rowan,

"Signed by the Arrested Party.

"Witness Mike Anglin

"D. R. Rutherford

"O. R. Jones

"Read aloud by deft—12:45 am—11-9-34—"

It is earnestly insisted that the alleged confessions of the defendant were made under such circumstances as rendered them involuntary.

A confession is a voluntary statement made by a person charged with the commission of a crime, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act, or the share and participation which he had in it. Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613.

Extrajudicial confessions are those which are made by the defendant out of court, whether to an official or nonofficial person. It is elementary law that such confessions, in order to be admissible, must be entirely free and voluntary. The rule is well established that confessions induced by a promise of benefit or a threat of harm, made to the defendant by a prosecuting attorney or an officer having him in custody, or by any one having authority over him, or made by a private person in the presence of one whose acquiescence may be presumed, will be deemed involuntary, and will be inadmissible as evidence. Miller v. State, 13 Okla. Cr. 176, 163 Pac. 131, L. R. A. 1917D, 383.

In this state it is a settled rule of practice that the admissibility of a confession where objection is interposed is primarily a question for the court, and should be determined preliminary to allowing the confession to go to the jury, and the burden is on the defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact. Berry v. State, 4 Okla. Cr. 202, 111 Pac. 676, 31 L. R. A. (N. S.) 849; Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613; Mays v. State, 19 Okla. Cr. 102, 197 Pac. 1064.

A statement, declaration, or admission made by one accused of crime, explaining suspicious circumstances, for his own defense, from which the jury may or may not infer guilt, is not a confession, and does not come within the rule that confessions must be voluntary to be admissible. Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613.

In the case under consideration the court had the witnesses before him, could observe their general conduct and appearance, and their manner of testifying, and the interest of the witnesses was a proper subject for considera-

tion and the burden was on the defendant. The court properly rejected the first confession offered. That the other two confessions were properly admitted there can be no doubt.

After a confession has been admitted, the defendant is entitled to have the evidence in regard to the manner in which it was obtained given anew to the jury, not that the jury may pass upon its admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence; and the jury may disregard it if they are not satisfied that it is voluntary.

In this connection the court instructed the jury as follows:

"No. 11. The state has introduced certain statements, both oral and written, claimed to have been made by the defendant while he was under arrest and in the custody of an officer charged with the offense for which he is now on trial, and which statements, in part, are relied on to establish the defendant's guilt of the offense charged against him; and in this connection the court instructs you that before such statements or confessions made by defendant after he has been arrested, relating to the offense for which he is under arrest, can be considered as evidence of the defendant's guilt, it must appear that the same were voluntarily made and were not procured or induced by promises, directly or indirectly made, that such statements would result in the defendant's benefit or advantage, or that the same was obtained as a result of force, fear, oppression or coercion. But if such confessions or statements, as introduced in evidence in this case, were made by the defendant freely and voluntarily and were made under circumstances showing that he was not induced to make the same by the promise or assurance from those who had him in custody that it would be to his interest to make the same, or should you find that the statements or confessions were not induced or resulted from fear, force,

coercion, or oppression, but were freely and voluntarily made; then you should consider the same in your deliberation on this case and give the same just such weight and value as you deem them entitled to.

"By the term 'voluntarily,' however, is not meant that it must have been spontaneous; that is, that the same came from the suggestion of the defendant.

"A confession, statement, or admission by the defendant does not have to proceed wholly at the suggestion of the defendant to be voluntary, and the fact that the same were elicited by questions propounded by the parties who had him in charge will not of itself render the same inadmissible.

"Should you be of the opinion that one or more of said purported confessions, statements or admissions were free and voluntary and some one or more were not free and voluntary; then you should reject such as you find were not free and voluntary and give the same no weight or consideration whatever, and give consideration to such as you find were free and voluntary, if such be your findings.

"Exception allowed.

"Frank Mathews, Judge."

The instructions given by the court are a model set, fully covering every phase of the law presented by the evidence, and were more favorable to the defendant than he had any legal right to demand.

One of the grounds of the motion for a new trial and assigned as error is that the extreme penalty assessed by the jury in its verdict is excessive.

No more serious duty can be imposed upon the courts than the duty of protecting, and the duty of taking, human life. We have carefully read the record independent of the assignment of errors and we find no error in the proceed-

364

ings. The evidence, consisting in part of the voluntary confessions of the defendant, conclusively and beyond any possible doubt, establishes his guilt of the crime. To all appearances a more wanton, brutal, and cruel murder was never perpetrated, and the jury was clearly warranted in the verdict which they rendered under the law and the evidence in the case. Any verdict other than the one rendered would have been a reproach upon the due administration of justice in this state.

We are entirely satisfied that the defendant had a fair and impartial trial in accordance with the most rigid rules of the law. By his own premeditated and diabolical act he has forfeited his life, and the stern but just penalty of the law must be enforced upon him. The judgment appealed from is therefore affirmed.

The day fixed for the execution of the judgment and sentence having passed, owing to the pendency of the appeal, it is considered, ordered, and adjudged that the judgment and sentence of the district court of Jackson county in this case be carried into execution on the 20th day of September, 1935.

The warden of the penitentiary at McAlester is ordered and directed to cause the sentence to be executed according to law.

DAVENPORT, P. J., and EDWARDS, J., concur.