## WILLIAM MAYS v. STATE.

No. A-3528.   Opinion Filed June 3, 1920.
Rehearing Denied June 3, 1921.
(197 Pac. 1064.)
(Syllabus.)

1.   **Appeal and Error — Review — Sufficiency of Evidence.**
The judgment in a murder case will not be reversed on appeal
as not sustained by the evidence, unless there is no substantial
evidence tending to show the guilt of the defendant, or unless
it fails so far to support the verdict that the necessary infer-
ence is that the jury acted from partiality or prejudice, or was
controlled by undue influence.

2.   **Evidence — "Confession."** A confession is a voluntary state-
ment made by a person charged with the commission of a crime,
wherein he acknowledges himself to be guilty of the offense
charged, and discloses the circumstances of the act, or the share
and participation which he had in it.

3.   **Same — "Extrajudicial Confessions."** Extrajudicial confessions
are those which are made by the defendant out of court, whether
to an official or nonofficial person, and such confessions, in or-
der to be admissible, must be entirely free and voluntary.

4.   **Same — Involuntary Confession.** Confessions induced by a
promise of benefit or threat of harm, made to the defendant
by a prosecuting attorney, or an officer having him in custody,
or by one having authority over him, or made by a private
person in the presence of one whose acquiescence may be pre-
sumed, will be deemed involuntary, and will be inadmissible as
evidence.

5    **Same — Admissibility — Burden of Proof.** Where the competen-
cy of a confession is challenged on the ground, that, if made, it
was not voluntary, its admissibility is primarily a question for
the court. In the absence of the jury, the court should hear the
evidence offered respecting the facts and circumstances attending
such alleged confession, and the burden is on the defendant to
show that it was procured by such means or under such cir-
cumstances as to render it inadmissible, unless the evidence on
the part of the state tends to show that fact. If it is held com-
petent, and the proof of the same admissible, the defendant is en-
titled to have the evidence in regard to the facts and circum-
stances under which it was made given anew to the jury, not that
the jury may pass upon its competency or admissibility, but
for the purpose of enabling them to judge what weight and value
should be given to it as evidence, and the jury may disregard it
if they are not satisfied that it was voluntarily made.

6.   **Same—Voluntary Confession—Admissibility.** The fact that the
defendant was under arrest and in jail, and was not warned that

any statement was made by him might be used against him, will not affect the admissibility of any voluntary statement made by him, which would otherwise be competent.

7. **Same—Voluntary Confessions—Admissibility.** The fact that statements of the defendant offered as a confession of murder were made to the arresting officer in answer to questions which assumed his guilt, and that the officer told him that it would be better to tell the truth, does not show that the confession was not voluntary.

8. **Same—Character of Confession for Jury.** In a trial for murder, held, on the evidence that whether the alleged confessions of the defendant were voluntary was for the jury. Held, further, that where the voluntary nature of the confession was submitted to the jury under proper instructions, a verdict against the defendant is conclusive on the issue.

9. **Same—Conviction—Proof of Corpus Delicti.** An extrajudicial confession of the defendant is not sufficient to warrant his conviction without additional proof that the crime charged has been committed. There must be, in addition to the confession, proof of the corpus delicti, and where the corpus delicti is established by independent evidence, a conviction based upon the defendant's voluntary confession is warranted.

10. **Trial—Conduct of Jury—Inspection of Weapon.** The mere fact that a juror picked up the pistol introduced in evidence and examined it as the jury were retiring to deliberate did not constitute receiving evidence out of court.

11. **Same—Juror Speaking to Bystander.** The fact that while the jury were in charge of the bailiff one of the jurors spoke to a bystander in the presence of the other jurors about a matter not connected with the case, while an irregularity, will not warrant a reversal of the judgment.

12. **Homicide—Sufficiency of Evidence—Modification of Death Sentence.** In a prosecution for murder, the evidence examined, and held sufficient to warrant the verdict convicting the defendant of murder, but insufficient to justify the extreme penalty, and for this reason the jury abused its discretion in assessing the punishment of death. The judgment and sentence is therefore modified to imprisonment for life at hard labor.

Appeal from District Court, McIntosh County; R. W. Higgins, Judge.

William Mays was convicted of murder and sentenced to death, and he appeals. Sentence modified, and conviction affirmed.

William Mays was convicted and the death penalty assessed for the murder of Kelsey H. Shephard, at Brush Hill, in McIntosh county on or about the 23d day of November, 1918.

Mrs. Shephard, widow of the deceased, the first witness for the state, testified:

"I saw my husband in the store just before dark.  He went to haul some wood.  I shut the front door of the store with the latch, and barred it with a wooden bar.  I went out the back door, locked it, and went home to cook supper.  It was after dark when he came in and unloaded the wood and went on to the store.  About an hour or an hour and a half from the time he left the store to go after the wood I found him in the store behind the counter, and he said  he  was shot.  I asked him if he knew who did it.  He said it was a white man or a yellow negro; that the man was  a  little smaller than he was.  I called my son-in-law to come and help carry him to the house, which was about 100 or 150 yards from the store.  Dr. Lee came and dressed his wounds. About Monday noon we took him to the  hospital at Muskogee.  He lived 13 days and died on the 6th day of December, 1918.  He was 49 years old the day before he died.  I am a citizen of the Creek Nation.  Lundy Allen is the husband of my oldest daughter.  My husband was her guardian. Lundy Allen lived 50 or 75 yards north and west of the store."

Dr. N. P. Lee testified:

"I found the deceased suffering from gunshot wounds. One bullet entered the right side just above the third interspace a little to the left of the nipple, and one in the left side just below the clavicle, and these wounds caused his death."

H. G. Caughran testified:

"On the 23rd of November, at Checotah, I heard a conversation between the defendant and a smaller yellow darkey, who said to the defendant; 'Are we going over yonder tonight?' and the defendant said, 'Yes: are you with me?' I was about 30 feet away from them at the time.  I never saw the defendant before that I know of."

Frank Wiser testified:

"I am in the mercantile business at Brush Hill; I have seen the defendant off and on for 2 or 3 years. About 7 o'clock that evening the defendant and McKinley Mims came into my store and one of them asked if I had any 38 cartridges; said he wanted 50 cents worth, and I sold him 20 cartridges. Proctor, a colored man, was in there. I don't know who left first, Proctor or the defendants. There was nothing out of the ordinary in the conduct of the defendants that evening. I heard a wagon going west. My store faces south, and Shephard's store faces east. It is about 100 yards west of my place. Something like 30 minutes after these boys left the store I heard a noise but could not say it was shots. I heard that I was accused of the killing. I don't remember who it was I heard it from."

Dan Moudy testified:

"I live a mile south and three-quarters east of Brush Hill. I was at deceased's place between 8 and 9 o'clock. I went to the store about 4 o'clock in the morning, and with some other parties made an investigation. I found a battered bullet in the back end of the store. It was laying on a box under a window. I noticed a hole cut in the front door and the glass of a window broken out. I was with the officers, and we followed some wagon tracks going west from the store that led to the Grayson farm. We tracked this wagon to where the road made a turn to Mims' house. The last wagon went on past this road and turned to the right, and made a circle and came back to the south towards Mims' house. I judge it to be a mile and a quarter from Shephard's store to Mims' house. The soil in the road around the west of the store was sandy and for a half mile west no timber."

J. W. Sampson testified:

"I live at Checotah; was deputy sheriff and went to Brush Hill with other officers. We arrived there between 1 and 2 o'clock. We all went to the Mims place, and found seven men and boys there in one room, and I saw colored women there. We arrested Will Mays and McKinley Mims. We found 17 cartridges in May's pockets. We investigated some tracks on the road. With me was McCune, Moore, Samp-

son, Wisner, and Frank Shephard and Bays, a detective from Muskogee, and possibly another one or two. We found where one wagon went west from the store, and we tracked the wagon to Mims' place. The soil is sandy for about half a mile west from the store. We started with the defendants to Brush Hill. We stopped on the way, and the defendant made a statement.''

At this point the state desired to introduce certain confessions made by the defendant. The defendant objected, and the court caused the jury to retire, and heard all the evidence offered bearing upon the question. After hearing the argument of counsel, the court overruled the defendant's objections, and held the alleged confessions admissible. The jury was recalled.

Lundy Allen, the next witness on behalf of the state, testified:

''I live at Brush Hill, about 50 or 75 yards northwest from Shephard's store. I am a son-in-law of Mr. Shephard. The last time I saw Mr. Shephard before he was shot was at his home just about dark you might say. It must have been three-quarters of an hour before I saw him again. He was behind the counter in the store, and he told me he was shot. That evening I went with Mr. Shephard after the load of wood and came back with him; I unhooked the team, and turned it into the lot by the well. Then me and my wife went home. About 20 or 30 minutes later I was sitting by the fire, and heard three explosions that sounded like gunshots, and I heard some one holler in the direction of the store. I ate my supper after I heard the shots. Then I went to Mr. Shephard's house, and from there to the store; I found the lamp on the floor in the store. It had no globe on it, and the oil had spilled on the floor. The next morning I tracked the wagons for a quarter of a mile west of the store; I didn't go any further. Afterwards I heard some talk that I was charged with the crime.''

M. B. Moore, undersheriff, testified that with the other officers he went to Brush Hill, and from there to Mims' place,

the next morning after the shooting, and they arrested William Mays and McKinley Mims; that they found 17 cartridges in the defendant's pockets, and 2 of them were snapped; that Mays delivered the pistol to him; witness produced the pistol and cartridges; that they took the defendants to Brush Hill, and from there to Checotah, and from there here; that there was a large crowd at Brush Hill; that at Checotah threats were made by the crowd, and an attempt was made by the mob to break into the jail there, and another mob stopped their car between Checotah and Eufaula.

Fannie Mims, the first witness for the defendant, testified that the defendant and her brother, McKinley Mims, went to Checotah with some other parties on the day Mr. Shephard was shot, and they returned home about 7 o'clock that evening; that all the children sat up until about 11 o'clock; that she saw the pistol that the officers took from the defendant in a bookcase in the boys' room about 10 o'clock that day, and saw it again about 5 o'clock that evening.

Nancy Allen testified that she was visiting at the home of Mims; had been there about a week when Mr. Shephard was shot; that she saw the pistol that the officers took from the defendant in the bookcase that day.

Kent Proctor testified:

"I live about two miles southwest of Brush Hill. I have known Will Mays about 8 years. I rode out from Checotah that day with Will Mays. We left there about 5 o'clock, and stopped at Brush Hill about 7 o'clock. We went into Mr. Wiser's store and I bought the boys a dime's worth of candy. I saw them leave Brush Hill, each of them driving a team to a wagon. They went west. When I started home they had passed Mr. Shephard's store. I could hear the sounds of those wagons as I walked down the road a half mile or a mile."

Cassie Mims testified:

"I am a brother of McKinley Mims. We went to Checotah the day Mr. Shephard was shot, Elgin Fox and I on a

load of cotton. Will Mays and McKinley Mims each drove a wagon home; I came back in a buggy. We all left Checotah about the same time, the wagons were ahead of us. As we came into Brush Hill, the boys were driving off from Mr. Wiser's store. We arrived home a little after 7 o'clock. The defendant and McKinley were at home when we got there.''

His further testimony was as hereinbefore stated.

Elgin Fox testified that he went to Checotah on the day Mr. Shephard was shot, and rode back with Cassie Mims in the buggy; that the defendant and McKinley left first, and they left about half an hour later.

Edward Mims testified that his brother McKinley and Will Mays left home that morning about 9 o'clock, with two wagons, and his father went along in the buggy; that the boys arrived home about 7 o'clock, and in about 5 minutes afterwards Cassie and Elgin Fox arrived in the buggy; that he saw the pistol taken by the officers laying in the desk after the boys left; that the next morning while they were all asleep the officers rushed in and hollered, ''get up boys,'' and said they were looking for whisky and ''Choc,'' and they searched the house. Finally they said they wanted to talk to the boys and took them out and then took them over in the bottom. I was about 100 yards away from the boys when the officers separated them. I heard them cursing Mays, but could not understand what was said.

Dan Moudy, called by the defendant, testified:

''I asked Mr. Shephard who shot him, and he said he didn't know. I said, 'Mr. Shephard, don't you know you are in a bad condition?' and he said he did. I said, 'If you know who did it, I would like to know.' He said, 'I could not be positive; I think it was a white man, a small like man.' ''

In rebuttal witnesses Sampson, Moore and McCune testified that they nor any of the other officers cursed the defendant or abused him in any way, and that none of them punched him with a gun.

The testimony as to the competency of and the alleged confessions will be stated in the opinion.

C. H. Tully and S. M. Rutherford, for plaintiff in error.

S. P. Freeling, Atty. Gen., and Crump & De Graffenried, Special Counsel, for the State.

DOYLE, P. J. (after stating the facts as above). Plaintiff in error, William Mays, herein referred to as the defendant, and McKinley Mims, were by information jointly charged with the crime of murder, committed by shooting Kelsey H. Shephard with a pistol, in McIntosh county on or about the 23d day of November, 1918. A severance was granted, and upon his trial the defendant, Mays, was found guilty of murder, and his punishment assessed at death. From the judgment and sentence pronounced in pursuance of the verdict he has appealed to this court.

The deceased was a merchant at Brush Hill. Between the hours of 7 and 8 o'clock p. m., on the date named, he was shot in his store. About an hour before he was shot he left the store to haul a load of wood to his home. His son-in-law assisted him in hauling the wood, and unhitched the team. The deceased then went back to his store, which was about 100 yards from his home. About 30 minutes later he was found by his wife crouched behind the counter. He told her he had been shot by a white man or a yellow negro. He died on the 6th day of December in Muskogee, where he had been taken for treatment.

The state offered testimony of a circumstantial character tending to show that the defendant fired the fatal shots, and offered in evidence alleged confessions of the defendant made to the officers who arrested him; also an alleged confession reduced to writing by the county attorney two days before the trial begun.

The errors assigned and relied upon for a reversal of the judgment and sentence in substance are: That the verdict is contrary to law, and that the verdict is not sustained by sufficient evidence; that the court erred in admitting in evidence alleged confessions of the defendant, because, if made, they were not voluntary; and alleged misconduct of jury.

This court has held repeatedly that it has no power to reverse a judgment of conviction upon the ground that the verdict is not supported by the evidence, unless there is substantial evidence tending to show the guilt of the defendant, or the evidence fails so far to support the verdict that the necessary inference is that the jury must have acted from partiality or prejudice, or have been controlled in reaching their verdict by undue influence. This court adheres to the rule that a conviction cannot be had on the extrajudicial confessions of the defendant without independent evidence of the corpus delicti, and, before such confessions should be admitted, there should be evidence prima facie sufficient to show that the offense to which the confession relates has been committed. The court must decide in the first instance this question. However, the decision of the court does not bind the jury, as the province of the court in such particular is only to determine whether sufficient evidence has been adduced to go to the jury for their determination. In passing upon the evidence submitted to them the jury must first determine beyond a reasonable doubt that the crime has been committed; then they are at liberty to give the alleged confession such weight as it is entitled to, taking into consideration the circumstances surrounding it and the extent to which it has been corroborated. In this case the corpus delicti was proved by independent evidence, and if the confessions of the defendant were voluntary and admissible, the issue of the defendant's guilt or innocence was clearly a question for the jury.

The serious question in this case is whether the alleged confessions of the defendant were voluntary or involuntary in contemplation of law, and whether this should have been determined by the court or whether under the evidence it was properly left to the jury for its determination.

In the course of the trial, J. W. Sampson testified that he was a deputy sheriff, and with Moore, undersheriff, and McCune, sheriff-elect, arrested the defendants the next morning, and started with them to Brush Hill; that on the way they stopped and separated the defendants. Being asked if the defendant made any statement, counsel for the defendant objected, and asked leave of the court to examine the witness and offer proof to show that the alleged confession was involuntary. The court then caused the jury to retire. Examined by counsel for the defendant, witness testified:

"I think I told him the thing for him to do was to tell us all about it; that he knew all about it. We told him he knew all about it, and wanted him to tell us all about it. We stopped, I judge, 10 or 15 minutes. I don't remember seeing a fire being built. I heard no threats."

Examined by counsel for the state, witness testified:

"He asked if Mr. Shephard was shot, and we told him he ought to know, and he said, 'Well, he didn't aim to hurt him; he was good to us;' and then we asked him how he come to shoot him, and he said he went in there to get a pair of shoes, him and the other boy, and Mr. Shephard come in on them and lit the lamp, and he didn't know what made him shoot him. We never made him any promises, just told him he had better tell the truth; I never heard any threats made, and I was right close to him."

The testimony of witnesses McCune and Moore, called by the state, was, in substance, the same. All these witnesses testified that no threats of any kind were made against the defendant, and no promises of any kind were made in order to induce him to confess, and that the confession made by the defendant was voluntary.

The defendant called Cassie Mims, who testified:

"I was at home when the officers arrested the defendants. They went with them over in the bottom, and there separated them. They surrounded the defendant, Mays, and were cussing and going on. I heard them say, 'You jumped in your damn wagon; say it, God damn you,' and I could see them punch at him; I was about 100 yards from them at the time."

After hearing the evidence and argument of counsel the court held the alleged confession admissible. The jury was recalled.

N. M. Burton testified:

"I am county commissioner. I saw the defendant in the sheriff's office the next night after the shooting of Shephard. Sheriff Moore and two or three other officers were present, and the defendant made a statement."

Over the objection of the defendant the witness was allowed to testify:

"I asked him if he was the one that did the shooting. He said, 'Yes,' and I asked him what he broke in the store for, and he said he wanted to get some shoes."

There was no threat or promise made. Cross-examined, he stated:

"The defendants were handcuffed together, and had not been taken to the jail at the time."

J. W. McCune, sheriff, testified:

"We found the defendants in bed, and took them to Brush Hill, from there to Checotah, and then here. On the way from the Mims' home to Brush Hill we stopped in the bottom a little while, and the defendant, Mays, made a statement."

Objection was made, and leave of court asked by counsel for the defendant to examine the witness. Leave was grant-

ed and witness testified:

"I did not warn the defendant that any statement he might make would be used against him. I did not see any violence offered to him, and I did not see him punched or anything of that kind. There were four of us with him; two or three other men came up before we left there."

Over the defendant's objection witness was allowed to testify:

"The defendant asked what had happened and finally asked, 'Has somebody been shot?' I said, 'You know what has happened; you know better than anybody what has happened; you don't have to ask what has happened.' I stepped away, and was speaking to Killingsworth, and as I stepped back I heard the defendant say that he did it, and then he said, if we would take him to the store he would show just how it all happened. When we got to the store building he showed where Mr. Shephard was standing, about midways of the store, and he said he was just behind the counter when he fired the first shot, and he stepped back with Mr. Shephard crowding him and shot again. Then he backed on and shot again. That Mr. Shephard sank down, and he went out the front door and ran. He said McKinley Mims cut a hole in the door, put his hand in there and raised the crossbar, and they went in. That Mims told him that he broke out the window. Then they got in their wagons and went home. That two or three nights ago the defendant made a statement that was typewritten by Judge O'Reilly, county attorney. That Undersheriff Moore and jailer, Jack Hunter, were present at the time. That the county attorney told the defendant that the statement would possibly be used against him in evidence. That the statement was read to the defendant before he authorized witness to sign it for him, and the defendant made this statement voluntarily."

Against the objections of the defendant the typewritten confession was offered in evidence and read to the jury. It is as follows:

"State v. William Mays and McKinley Mims.

"Statement of William Mays.

"On the morning nearly 12 o'clock McKinley Mims and myself drove two wagons to Checotah. My wagon was loaded with cotton and McKinley's wagon had Mrs. Mims and Hilly Rones in it. Both Mrs. Mims and Hilly took the train at Checotah. Late in the afternoon we started back home to Mr. A. M. Mims' home in our wagon, McKinley drove in front of me; we stopped at Mr. Wiser's store and bought 20 cartridges 38-calibre cartridges, that fit McKinley Mims' pistol. After getting the cartridges we drove down the road towards home, west of Mr. Shephard's store. There we stopped our teams and went back to Mr. Shephard's store. On the way back to the store McKinley Mims gave me the pistol with which I shot Mr. Shephard.

"When we got to the store McKinley cut a hole in the front door and stuck his hand through the hole and raised a crossbar that fastened the door. We both entered the store. We were not in the store but a short time when Mr. Shephard came in upon us and lit a lamp that was on the counter. As soon as he lit the lamp I shot him. I think the lamp went out at the first shot. I shot two more shots. I was about 10 feet from him when I shot the first shot. I think he came towards me after the first shot. I don't know whether he ever touched me or not. He was down in sorter of a sitting position when I ran out. When I first shot Mr. Shephard was on front side of counter, but came behind the counter before he sank down. Both of us were behind the counter when I shot the last shot. I had to go out by him or over him.

"McKinley Mims went into the store just in front of me, but I do not remember seeing him any more after Mr. Shephard arrived until I got back to our wagon, but he told me that he went out of the store window. When we got to our wagons we left in a fast trot; my wagon was in front. When we got to the lane turning south McKinley failed to turn his team into the lane, and ran his team past the lane, and had to circle back. He told me this. I do not recollect seeing him circling back.

"The pistol I had belongs to Mrs. A. M. Mims. I threw the pistol on a bed when I got to the house, McKinley overtook me, and passed me a little before we got to the lot gate. We took out our teams and turned them loose in the field. I delivered the pistol to the officers the next morning. Ed. Mims had placed the pistol where I got it when I gave it to the officers.

"There was something said about what we were going to do that night about the time we left Checotah, but I have forgotten what it was. McKinley mentioned it to me, but I have forgotten just what was said.

"This conversation was about going into the store. We first talked about and agreed to going to Mr. Shephard's store that evening before we left Checotah. McKinley Mims was the one that suggested the going into the store. I cannot sign my name.

"I have made the above and foregoing statement freely and voluntarily, without any promise whatever, and after being told by the officers present that it may be used against me.

his<br>
"(Signed) William X Mays.<br>
mark

"The signature of William Mays was written by me in his presence and at his request, this the 3d day of February, 1919.

"Witness to mark:

"(Signed) :    J. W. McCune.
"(Signed) :    E. I. O'Reilly."

As a witness in his own behalf the defendant testified:

"I am 37 years old, I guess. I have lived the last 6 or 7 years at Mims, where the officers arrested me; McKinley bought four bits worth of cartridges that evening at Mr. Wiser's store. I paid for them and carried them home. The officers took them out of my pockets. They took me out in the yard, and told me to get the pistol. One said, 'If you don't get it I will kill you.' I got the pistol out of the dresser

and gave it to Mr. McCune. They took me up in the woods. There was seven or eight of them around me, and they told me, 'You done said it, and you better say it, or we will kill you right here.' I says, ' I don't know what you are talking about.' When I asked them for what, they never did say. I said, 'Has somebody got hurt or something.' They said, 'You know.' I said, 'If I was to tell it, what would you do?' And they said, 'Not anything.' Some of them had guns and punched me with them, and said, 'Tell it, you know you did it; God damn you, tell it; you jumped in the wagon and ran off; tell it.' They had me scared, and I don't know what I did say now. I was not in Mr. Shephard's store that night, and I did not kill Mr. Shephard. The officers took me to the store and said, 'Tell how it was done.' I says, 'I don't know what you are talking about.' They tried to make me tell, I told them, 'I don't know what you are talking about.' They kept me there I guess about a couple of hours. Lots of other people came there and some of them says, 'They are making a fire for you all; you better be praying.' I said ' I haven't done anything.' They took us to Checotah and put us in jail, and a big crowd broke into the jail and began punching up through the cells, cussing and saying, 'You done said you done it; you better stick to it; we will kill you anyway.' I said, 'I didn't do it.' The officers were trying to keep them back, and they taken me on out to Bill Sampson's car, and we met another crowd on the road. They had logs laid across the road. They said, 'We have got to have him; you can't carry him no further;' and the officers said, 'Open up the road; we got them and we have to protect them.' I remember when I was in the sheriff's office. Me and McKinley was handcuffed together and Mr. Burton said, 'I was told you said you done it.' I says, 'I haven't done anything.' He says 'What have they got you charged with?' And I says, 'With shooting a man,' and he says, 'Did you do it?' and I says, 'No, sir; I didn't do it.' The sheriff, Mr. McCune, and the jailer took me to the county attorney's office. I was handcuffed. This fellow sitting right here made the statement. He said, 'You done told it.' I said, 'No, sir; I didn't tell them anything.' He said, 'You done told everybody, and everybody knows it, and it has got to be printed down.' I said, 'If I

did, I don't know anything about it.' I never told anybody I was in that store to get some shoes. I don't exactly know what all I told him; I only said what they told me to say. My father and mother live down about Seminole. I like Mr. Mims, he treated me better than they do, and I stays with him.''

It was and is earnestly insisted that the alleged confessions of the defendant were made under such circumstances as rendered them involuntary.

A confession is a voluntary statement made by a person charged with the commission of a crime, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act, or the share and participation which he had in it. Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613.

Extrajudicial confessions are those which are made by the defendant out of court, whether to an official or nonofficial person. It is elementary law that such confessions, in order to be admissible, must be entirely free and voluntary. The rule is well established that confessions induced by a promise of benefit or a threat of harm, made to the defendant by a prosecuting attorney or an officer having him in custody, or by any one having authority over him, or made by a private person in the presence of one whose acquiescence may be presumed, will be deemed involuntary, and will be inadmissible as evidence. Miller v. State, 13 Okla. Cr. 176, 163 Pac. 131, L. R. A. 1917D, 383.

The object with which the law admits a confession in evidence is to obtain truth. The only ground on which a confession is rejected is that the circumstances under which it is obtained have a tendency to falsehood; and therefore the object with which it is admitted, instead of being secured, is likely to be frustrated. Bishop says:

"The doctrine, in its essence and divested of its technicalities, is that a defendant's confession is admissible in evidence against him if made freely and without the hope of benefit to his cause; otherwise it is rejected, since its purpose may have been to secure such benefit rather than to disclose the truth." Bish. New Cr. Proc. par. 1217.

As Mr. Wharton has well said:

"The real question is whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth from the fear of the threat, or hope of profit from the promise." Wharton, Cr. Ev. § 658.

In this state it is a settled rule of practice that the admissibility of a confession where objection is interposed is primarily a question for the court, and should be determined preliminary to allowing the confession to go to the jury, and the burden is on the defendant to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact. Berry v. State, 4 Okla. Cr. 202, 111 Pac. 676, 31 L. R. A. (N. S.) 849; Wilson v. State, 17 Okla. Cr. 47, 183 Pac. 613.

Prof. Wigmore says that this is the practical and natural rule, "for, if there is any reason to object to the confession, no one can know it better than the defendant." He says further:

"Looking at the general principles of admissibility and the comparative rarity of untrustworthy confessions, as well as the contingent nature of the dangers supposed to flow from improper inducements, the more practical rule would be to receive confessions without question, unless they are shown to have been improperly induced, especially since a contrary rule may involve the difficulty of proving a negative." Wigmore on Ev. par. 860.

In Anderson v. State, 8 Okla. Cr. 90, 126 Pac. 840, Ann. Cas. 1914C, 314, it is held:

"The fact that a prisoner may be under arrest and in jail, and was not warned that any statement made by him might be used against him, will not in any manner affect the admissibility of any voluntary statement made by him which would otherwise be competent."

And a confession will not be rejected merely because it was made in answer to a question which assumed his guilt, and that the officer told him he had better tell the truth. Prof. Wigmore says:

"On principle the advice by any person whatever that it would be better to tell the truth cannot possibly vitiate the confession, since by hypothesis the worst that it can evoke is the truth, and there is thus no risk of accepting a false confession. The confessor is not obliged to choose between silence and a false confession having powerful advantages. The advantages are attached to the utterance of the truth; and, however tempting we may suppose them to be, there is nothing in the nature of the temptation to make the statement untrustworthy; for if it has availed at all, it has availed to bring out the truth. Sound opinion refuses to exclude a confession induced by such exhortation; and the weight of authority in this country, though not in England, repudiates such an exclusion." 1 Wigmore on Ev., par. 832.

There is a direct conflict in the evidence as to whether or not the confessions of the defendant were voluntary, and the burden was upon the defendant. It follows that the court properly ruled that the alleged confessions were admissible in evidence against the defendant.

After a confession has been admitted, the defendant is entitled to have the evidence in regard to the manner in which it was obtained given anew to the jury, not that the jury may pass upon its admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence; and the jury may disregard it if they are not satisfied that it is voluntary.

In this connection two instructions asked by the defendant were given by the court, and in addition thereto, the court instructed the jury as follows:

"No. 12. The court will instruct you that if you believe from the evidence that free and voluntary statements and confessions have been made by the defendant in reference to said homicide, then you may take them into consideration with all the other facts and circumstances proven in the case, and they should be given such weight as you may think them entitled to receive; but on the other hand, the court will further instruct you and say that, if there was any inducement held out, or threats of violence offered to the defendant to secure from him a confession, and that he, acting under such inducements or threats or violence of any kind, did make a confession, then the court will say to you that you should not consider such confession, if any, in arriving at your verdict. For confessions to be competent for your consideration they must be freely and voluntarily made by this defendant, then such confessions, if any, made by him should not be considered by you."

It was the province of the jury to say whether or not the confessions were voluntary, and we cannot say upon the evidence presented that the jury were not justified in concluding that the confessions were voluntary.

The remaining assignment of error is based upon the alleged misconduct of the jury.

The undisputed facts as shown by the evidence offered in support of this ground of the motion for new trial are: As the jury was retiring to deliberate, one of the jurors picked up the pistol that was introduced in evidence, and examined it. The defendant's counsel were present and made no objection. In regard to this it is enough to say that this did not constitute receiving evidence out of court. See Hopkins v. State, 9 Okla. Cr. 104, 130 Pac. 1101, Ann. Cas. 1915B, 736. That while the jury in charge of the bailiff were passing to or from the courtroom one of the jurors in the presence and

hearing of the other jurors spoke to a bystander and said,. "You tell my wife that I can't get home, I am hung up on the jury." We deem it sufficient to say that there was no prejudice to the substantial rights of the defendant resulting from the irregularities complained of, and for this reason the court did not err in refusing a new trial upon this ground.

Upon a most careful examination we find no error in the record requiring a reversal of the conviction.

Finally, it is urged that the punishment of death is not warranted by the evidence, and should be ascribed to passion and prejudice, and that the judgment should accordingly be modified by this court. Where the appeal is from a judgment and sentence of death, it is the duty of this court to examine, with the greatest care, the whole record in favor of life, and review the case upon the merits to determine whether justice requires a modification of the judgment to imprisonment for life at hard labor.

In Noel v. State, 17 Okla. Cr. 308, 188 Pac. 688, it is said: "The most solemn and momentous duty courts are called upon to perform in the administration of the criminal law is to inflict the death penalty, and it should be inflicted only in extreme cases, when no other punishment will vindicate the law and protect society against the totally depraved. How careful, then, should we be in reviewing a capital conviction, before we lend our sanction to the taking away of that which, when taken away we cannot restore."

It must be admitted that the case against the defendant depended upon circumstantial evidence, in itself insufficient to sustain a conviction, unless the jury believed his confessions were voluntary.

The defense was largely in the nature of an alibi. It is undisputed that the defendant, a coal black negro, had lived for several years near Brush Hill, and was well known to deceased, yet the only statement made by deceased that was

offered in evidence was that a small white man or a yellow negro shot him. It is also apparent that the part of the defendant's confession, stating, "We stopped our teams and went back to Mr. Shephard's store," is in direct conflict with the evidence for the state concerning the wagon tracks. It is undisputed that on the day that he and his codefendant were arrested excitement ran high; mobs were formed at three or four places in the county, and attempts were made to take the defendants from the officers, and it may be that passion and prejudice, unconsciously or otherwise, tended to sway the jury against him in assessing the extreme penalty of the law. Taking all the circumstances of the case into consideration, it is our opinion that, although the evidence is sufficient to sustain a verdict of guilty of murder, yet it is insufficient to justify the extreme penalty, and for this reason the jury abused its discretion in assessing the punishment of death.

For the reasons stated, we are of opinion that justice requires a modification of the judgment and sentence of death to that of imprisonment for life at hard labor in the state penitentiary. The judgment of the district court of McIntosh county herein is so modified. As thus modified, the judgment is affirmed.

ARMSTRONG and MATSON, JJ., concur.