## BEN R. WILLIAMS v. STATE.

No. A-9463. Jan. 27, 1939.

(86 P. 2d 1015.)

Harry C. Kirkendall, of Enid, for plaintiff in error.

Mac Q. Williamson, Atty, Gen., Sam H. Lattimore, Asst. Atty. Gen., and Roy Holbird, Co. Atty., of Enid, for the State.

BAREFOOT, J. The defendant, Ben R. Williams, was charged in Garfield county with statutory rape, was tried, convicted and sentenced to serve 30 years in the penitentiary, and has appealed.

Among the errors urged for a reversal of this case are:

(1) That the court erred in permitting evidence of a purported confession of defendant made to certain officers while he was in jail awaiting trial.

(2) That the court erred in permitting certain evidence which it was claimed was a privileged communication.

(3) That the evidence offered by the state was insufficient to support the verdict.

(4) That the court erred in failing to instruct the jury upon questions which were material to the issues involved.

The evidence in this case revealed that defendant was arrested on the 4th day of August, 1937. He was immediately placed in jail. On the 5th day of August, 1937, the chief of police of the city of Enid, went to the county jail for the purpose of having a conversation with defendant, and took with him one of his police officers, so that he might listen to the conversation. The evident purpose of this visit was to have defendant speak of the circumstances surrounding the crime with which he was charged, in the presence of the chief of police and his subordinate officer. When this evidence was offered in the trial of the case the court excused the jury, and after hearing the witnesses, overruled the motion of defendant, and then permitted the witnesses to relate the conversation to the jury.

The chief of police testified:

"Q. I believe you stated in your preliminary examination by the county attorney that the conversation you had with the defendant, Ben Williams, took place about August 5, 1937, in the county jail? A. Yes, sir. Q. Was that pertaining to the case now pending against him? A. Yes, sir. Q. At that time did you inform him that any statement he made might be used against him as evidence, that you might testify as a witness in the case? A. It was just a casual conversation. Q. You didn't inform him of that, did you? A. No, sir. Q. Was there some conversation about his pleading guilty to the charge filed against him and receiving a sentence of two years? A. Yes, sir. Q. Was that mentioned? A. Yes, sir. Q. So the things he said to you were after you had mentioned to him that a two-year sentence might be arranged? A. No, sir, I don't think so. Q. When was it? A. I questioned him with relation to the girl and he admitted that he had a time or two. Q. What did he say? A. I asked him if he had had relations with Dorthy Lewis, and he said he had a time or two, but it wasn't rape, and I informed him of the seriousness of it, that 15 years was the least he could get and he informed me

that it wasn't rape in the first degree because she was willing, and that there had been other boys with her. Q. Can you give his exact words? A. That is, about his exact words. Q. Then you told him you would try to get him two years? A. My understanding with him was that it was two years, for second degree rape, if she was willing. * * * Q. But the degree of rape was discussed there between you and he? A. Yes, sir. Q. You have been apprised of the statutory penalties? A. Yes, sir. Q. Who had told you? A. The county attorney. * * * Q. Now, Chief Hess, would you say when that conversation was had, and the same conversation, it was stated that the reason which he offered to plead guilty was that he would get two years? A. Let's get that again. Q. He never did offer to plead guilty to anything with a penalty of more than two years, did he? A. No, sir."

The police officer, Earl Moore, who accompanied the chief, testified to the conversation before the court and jury as had the chief, and also testified as follows:

"Q. Who asked you to go there? A. The chief. Q. He asked you to go and listen to the conversation with Ben Williams, did he? A. Yes, sir. Q. And you did? A. Yes, sir. Q. Do you know if Ben Williams had been told, or informed of the nature of the charge against him at that time? A. Yes, sir, it was mentioned to him at that time. Q. You don't know whether the warrant had been read to him or he had been furnished with a copy of it? A. I couldn't say. Q. Who mentioned the nature of the charge? A. The chief. Q. What was said? A. He said he was charged with an offense of illicit conduct. Q. That is what he said it was? A. As near as I remember. Q. Did he say anything about the punishment? A. No, sir. Q. Nothing said about the punishment? A. No, sir. Q. Did he tell Ben Williams that any statements he might make at that time would be used against him in the trial of the case, that he would take the stand and testify against him? A. Yes, sir. Q. You heard him tell him that? A. Yes, sir. Q. Is that the words he used? A. I don't know whether that is the exact words or not. Q. Did he tell him he wouldn't have to make any statements if he didn't want to? A. Yes, sir. Q. And that if he made a statement it could be used against him in the trial of the case? A. Yes, sir.

Q. You heard him say that? A. Yes, sir. Q. Did you hear him say anything about if he would plead guilty what penalty he would get? A. No, sir. Q. Didn't he tell him if he would plead guilty he would get two years? A. No, sir. * * * Q. Did he tell you he wanted you to talk to him? A. No, sir. Q. Just to listen in? A. Yes, sir. * * * Q. Did Chief Hess tell you he was going to have a conversation with Ben Williams? A. Yes, sir. Q. And asked you to go along and listen in? A. Yes, sir. * * * Q. What did he say? A. He said it would be used against him. Q. Did he tell him he would testify to what he said? A. Yes, sir. Q. Did he tell him he didn't have to talk unless he wanted to? A. Yes, sir. Q. He told him that? A. Yes, sir. * * * Q. Was there any conversation about the punishment he should receive if he plead guilty? A. No, sir. * * * Q. Did you hear a conversation there in which Ben said that he had not done anything, but to save the girl's name he would take two years to keep the girl out of court, did you hear any conversation about that? A. I heard him say something about that he would take two years. Q. To keep the girl out of court? A. Yes, sir. Q. Did he say that was his wife's sister? A. Yes, sir. Q. In that conversation? A. Yes, sir. Q. That is all you had? A. I didn't have any. Q. That is all the one you were present at? A. Yes, sir. Q. You forgot that while ago, did you? A. He said he would take two years if he could. Q. To save the disgrace on the family, wasn't that right? A. There was something mentioned about the disgrace in the family."

It will be noted that there is a direct conflict in the evidence of the chief of police and Officer Earl Moore. The chief testified that he at no time warned the defendant that the statements which he made might be used against him, and Officer Earl Moore testified positively that he was warned by the chief. Yet both of these witnesses were present and heard the same conversation. The chief of police also testified as to the conversation with reference to defendant expressing a willingness to plead guilty and take a two year sentence. Officer Moore testified that there was no such conversation, but finally admitted on cross-examination that he had heard the two years mentioned.

The question of the admissibility of confessions or statements made by a defendant while under arrest, and where inducements were made to him for the purpose of securing a statement has been before this court many times. In the case of Mays v. State, 19 Okla. Cr. 102, 197 P. 1064, this court speaking through Judge Doyle, says [page 1070]:

"A confession is a voluntary statement made by a person charged with the commission of a crime, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act, or the share and participation which he had in it. Wilson v. State, 17 Okla. Cr. 47, 183 P. 613.

"Extrajudicial confessions are those which are made by the defendant out of court, whether to an official or nonofficial person. It is elementary law that such confessions, in order to be admissible, must be entirely free and voluntary. The rule is well established that confessions induced by a promise of benefit or a threat of harm, made to the defendant by a prosecuting attorney or an officer having him in custody, or by anyone having authority over him, or made by a private person in the presence of one whose acquiescence may be presumed, will be deemed involuntary, and will be inadmissible as evidence. Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L.R.A. 1917D, 383.

\* \* \*

"Bishop says:

" 'The doctrine, in its essence and divested of its technicalities, is that a defendant's confession is admissible in evidence against him if made freely and without the hope of benefit to his cause; otherwise it is rejected, since its purpose may have been to secure such benefit rather than to disclose the truth.' Bish. New Cr. Proc. par. 1217.

"As Mr. Wharton has well said:

" 'The real question is whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth from the fear of the threat, or hope of profit from the promise.' Wharton, Cr. Ev. § 658."

The above principles have been followed by this court in many decisions and constitute the general rule as announced by practically all of the states. Kearns v. State, 14 Okla. Cr. 142, 168 P. 242; Taylor v. State, 27 Okla. Cr. 165, 225 P. 988; Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L.R.A. 1917D, 383; Bram v. United States, 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568.

In reading the cases it will be readily noted that there is an apparent conflict in some of the decisions, but this is generally caused by the actual facts in each particular case. The fundamental principles are generally recognized by all the courts in all the decisions. Some of these fundamental principles are as announced in the above case. When the confession of a defendant is freely and voluntarily made, they are competent as evidence against him. Where they are not freely and voluntarily made it is error to admit them. Confessions or statements procured or induced by a promise of benefit or threat of harm, made a defendant by a prosecuting attorney, or an officer having him in custody, or by one having authority over him, or made by a private person in the presence of or acquiescence of one in authority will be deemed involuntary and inadmissible. By this it is not meant to be said that a defendant may not make a voluntary statement even to an officer who had him in charge, but it is certainly the best practice that he be warned that any statement which he makes may be used against him, and that there should not be an inducement held out to him that he will be benefited by the making of the statement or confession.

Applying the general principles, as announced above, to the instant case, one cannot but be convinced that the statement made by the defendant in this case was made as a result of an honest belief on his part that he would be charged with a crime, which would permit him to receive a penalty of two years in the penitentiary. The officer to whom he made the statement says that this was mentioned,

and further testifies that he told defendant he had conferred with the county attorney, and while in answer to questions by the court, the chief of police recognized that he did not have the power and authority to promise the defendant he would receive a sentence of two years, yet the court seemed to recognize that from the evidence, the defendant had been led to believe that this would be the sentence, for the court at the time the chief of police was testifying, said:

"The Court: You realize that you had no right to tell him what sentence he would get. A. That is what I told him. The Court: I asked you that so you will know, and advise your officers that the sentence and judgment is up to the court and the officers have no right to make them any promises as to what will be done."

The defendant was first charged by information in this case with rape in the second degree. While he was being held in jail on this charge the county attorney made a motion to dismiss this charge, which was sustained by the court. A complaint charging him with rape in the first degree was filed in the justice court. He was then tried by information filed in the district court charging him with rape in the first degree, and the jury assessed his punishment at confinement in the penitentiary for a period of 30 years.

Counsel for defendant contends that the county attorney did not have the right to dismiss the charge, and file a new charge except upon order of the court, and that, therefore, the court did not have jurisdiction in this case. We are of the opinion that the county attorney had the right, under the direction of the court, to dismiss a case and file a new charge if he saw fit to do so. This did not defeat the jurisdiction of the district court in this case.

It is next urged that the court erred in permitting Dr. R. H. Wigner and his wife to testify to certain conversations had with defendant, for the reason that they were

confidential and should not, therefore, have been permitted to go to the jury. The evidence revealed that Dr. Wigner was a regular practicing physician in the city of Enid. His wife attended the reception room of her husband, who had his office at his residence, and was his assistant in the office. The defendant, during the early part of August, 1937, took the prosecutrix to the home of Dr. Wigner for the ostensible purpose of having her examined to determine whether or not she was pregnant. The doctor was busy with an operation at the time and asked defendant to return, which he did the same day. Both the doctor and his wife, over the objection of defendant, were permitted to give in detail the conversation between the defendant and Dr. Wigner.

It is urged by the state that this testimony was admissible for the reason that defendant was not the regular patient of Dr. Wigner, was not consulting him as such, and any statement made by him to Dr. Wigner would not come within the rule prohibiting testimony of a physician or surgeon concerning any communication made to him by his patient, with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of any such patient. And for the further reason that Mrs. Wigner was not a physician, and statements made to her, or in her presence, would not be privileged, and within the rule prohibiting proof thereof.

Section 272, Okla. Stats. 1931, 12 Okla. St. Ann. § 385, provides:

"The following persons shall be incompetent to testify: * * *

"6. A physician or surgeon concerning any communication made to him by his patient with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of any such patient: Provided, That if a person offer himself as a witness, that is to be deemed a consent to the examination; also, if an

attorney, clergyman or priest, physician or surgeon on the same subject, within the meaning of the last three subdivisions of this section."

It will be noted from this statute that a physician or surgeon is prohibited from testifying to any matter concerning any communication made to him by his patient, with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of any such patient, and under the terms of this statute the argument made by the state does not appeal to us. The defendant had taken the prosecutrix to the office of Dr. Wigner for the purpose of having her examined. His office was at his residence and his wife was his assistant. It was for this reason she was permitted to hear the conversation between the defendant and the doctor.

Both of these parties testified, not only to the examination of prosecutrix, but to conversations of defendant and the doctor. These conversations were with reference to whether or not the prosecutrix was pregnant, and the inquiry by defendant if the doctor knew of any medicine that would relieve her if she was in that condition. These statements could have, and evidently did have, great weight with the jury in the determination of their verdict. It was the contention of the defendant in his testimony that the prosecutrix had told him that she had been playing around with neighbor boys, and it was for this purpose that he consulted a doctor before she was to enter school. It occurs to us that to permit this conversation under these circumstances is in direct conflict with the statute. The argument that the relation of doctor and patient did not exist is untenable. The defendant, although he may not have been a regular patient himself, went to the doctor for the purpose of obtaining professional advice, and certainly any communication had between him and the doctor should have been a privileged communication under the statute, and to say that the wife can testify because the relation of physician and patient did not exist between

them, is also untenable. She was present because she was the assistant of her husband, and was acting in this capacity at the time the conversation was had. It is often necessary for those who assist the doctor as a nurse or attendant to be present at conversations between the patient and doctor, and little good would be subserved, if the lips of the doctor could be sealed by statute as to conversations, but the nurse or attendant might testify to all that was said and everything that was done. The purpose of the law was to protect the right of privacy, and while its scope should not be unduly extended, its very intention might be completely thwarted by the admission of this character. Homnyack v. Prudential Insurance Co., 194 N. Y. 456, 87 N. E. 769; Culver v. Union Pacific Ry. Co., 112 Neb. 441, 199 N. W. 794; Howe v. State, 34 Okla. Cr. 33, 244 P. 826.

The evidence in this case revealed that defendant was charged with the crime of statutory rape upon the prosecutrix, Dorthy Lewis, a female under the age of 14 years, she being 12 years of age. She was the sister of defendant's wife. She was one of 10 children, and her father was in poor circumstances as to worldly goods. Defendant was engaged in the sale of oleomargarine in the city of Enid. He made deliveries each week to residences in different parts of the city. He employed prosecutrix to assist him in making deliveries, and to keep his books, which consisted of tabulating the deliveries, and putting in a book the amount each person desired the next week. She received as compensation $1.50 per week. Her employment began in June, 1937, and extended to August, 1937. It was during this time it was claimed defendant had improper relations with her upon two different occasions, and while they were making deliveries of oleomargarine in the city of Enid. Her testimony is vague and uncertain. She testifies that defendant, on at least three occasions after they had made the deliveries, drove in the automobile to the edge of the city in the daytime and felt of her private

parts, and on two different occasions, as she expressed it, "he put it in." One of these times being by the Rock Island, and once at Hellums Dam.

The county attorney was required by the court to elect upon which of the charges he stood, and he elected to stand upon the charge at Hellums Dam. Her testimony with reference to this occasion was contradictory, and was as follows:

"Q. What would take place there? Between you and Mr. Williams? Mr. Kirkendall: Don't lead her, let her tell. A. We would stop the car. Q. You were in the car there, then what would be done? A. I would get off and then we would start back to town. Q. Dorthy, before you would get off, and while you were on Mr. Williams' lap, what would he be doing with you? A. Feeling of me. Q. What part of you would he be feeling of? You said he would be feeling of it. What did you say you would do while you were on his lap? A. He would touch it. Q. Do you mean he would touch your female parts, you know what that is? A. Yes, ma-am. Q. Is the place down in front of you here? A. Yes, sir. Q. How many different occasions was there that he drove out and he just 'felt of it'? A. About three times. Q. Where were those places those times? A. Two times out there by the Rock Island and two times out there where the big mills are. Q. He played with you how many times you said awhile ago? A. Three times. Q. The last time you went out here by the mill, you say, what did he do to you? A. He put it in. Q. Do you know what it was he put in, some part of him, was it, into some part of you? The Court: Let her tell it. Q. And that was out here in the vicinity of the mill, out this way? (Pointing) A. Yes, sir. Q. One time you said he just 'played with it'? A. Yes, sir. Q. And the other time he put it in? A. Yes, sir. Q. That is right, is it? A. Yes, sir. Q. You could feel it, could you? A. Yes, sir. Q. Did you ever drive anywhere else, any place, after that time, that was four times? A. Not 'till up here by Hellums. Q. Dorthy, will you explain to me and these gentlemen how you go to Hellums? A. Go out on the pavement and go where the turn is. Q. How do you know where the turn is? A. Out by the stands. Q. Out on the highway, how do you know where to turn? A. A turn there that goes like that. (Indi-

cating) Q. That goes toward Hellums, does it? A. Yes, sir. Q. Is there a marker that tells you out there? A. When you go to Hellums there is a sign there. Q. You went out that way, did you, and did you go into the Hellums' gate there? A. No, sir. Q. Which way did you go then? A. We went to where that road is and turned and went north. Q. How far did you go north? A. I don't know. Q. You didn't measure the miles, did you pass anything, did you pass the two or three roads down that way? A. We went to the first or second road and turned east. Q. At that time, Dorthy, what did you do out there, was the car stopped again? A. Yes, sir. Q. Was there anyone else along besides you and Mr. Williams? A. No, sir. Q. Just the two; what did you do then? A. He just felt of it. Q. He just felt of it? A. Yes, sir. Q. After he felt of it, you stated about three times before he felt of it, and then did something else, this was the last time, what did he do up there? This is up there by Hellums, you told about four times, three times he played with it. A. Out there by Hellums he just touched it. Q. Let me ask you if at that time did you kind of sit across his lap, that time? A. Yes, sir. Mr. Kirkendall: That is objected to as leading. The Court: Let her do the answering. Mr. Holbird: It is important that we be allowed some latitude in examining this witness. The Court: We are giving you some. Q. Do you know what he touched it with out there at Lake Hellums, was it his hand, or the private part? Mr. Kirkendall: We object to the suggestion. A. He never touched it. Q. What did he do it with? A. Touched it with his hand. Q. How many times is that in all? A. Five times. Q. The first three times what did he do? The Court: She testified to that. A. He just touched it. Q. Then the next two times what did he do? A. He put it in. Q. The next two times, one time out here by the mill? A. Yes, sir. Q. The last time was where? A. Out there by Hellums. Q. Is that what you meant awhile ago? A. Yes, sir. * * * Q. Now Dorthy, these two times you say, 'he put it in,' those were the first times, the first time was here close to Enid? A. Yes, sir. Q. Then you would say that is in Garfield county? A. Yes, sir. Q. And the next time was pretty close to Lake Hellums? A. Yes, sir. * * * Q. Which direction did you go? A. North. Q. North from Lake Hellums? A. Yes, sir. Q. Did you turn north right at Lake Hellums? A. When we got there we turned north and then we turned

east. Q. Do you mean the entrance into the Lake Hellums place? A. No, sir. Q. Where do you mean? A. The road this side of it. Q. You turned at the road this side of it? A. Yes, sir. Q. On which side of it? A. On the east side of it. Q. On the road east of Lake Hellums, you went north? A. Yes, sir. Q. And then back east? A. Yes, sir. Q. Do you know who lives up there? A. No, sir. Q. How far east did you go? A. I don't know. Q. That would take you right back to the pavement, wouldn't it? A. Yes, sir. Q. You sat on his lap out there? A. Yes, sir. Q. Then you came back to town? A. Yes, sir. Q. That was in broad daylight, was it? A. About 4 o'clock. Q. You don't know the day of the month or the day of the week it was? A. No, sir. Q. You didn't tell your mother or father about this? A. No, sir. Q. Did you tell your sister, Mrs. Williams? A. No, sir. * * * Q. Then you went to Lake Hellums once? A. Yes, sir. Q. That is the time you sat on his lap? A. Yes, sir. Q. Where did you go next? A. Nowhere, we came back home. Q. Did you go out of town with him any more after those three times? A. No, sir, I never went out of town, I just went out here by the tracks. Q. What tracks? A. The Rock Island. Q. You know where the Rock Island Depot is? A. Yes, sir. Q. Is that where you mean? A. Yes, sir. Q. That was in daylight? A. Yes, sir. Q. The tracks go out south. You went down the road there? A. Yes, sir. Q. Some people live down there, didn't they? A. No, sir. Q. How far did you go? A. There is a house about four or five blocks. Q. That was in daylight too, was it? A. It was about 4:30. Q. That was in June or July, was it not? A. Yes, sir. Q. It wasn't dark yet at 4 or 4:30, was it? Do you know what time it does get dark? A. About 7. Q. Then you went back home? A. Yes, sir. Q. And you didn't say anything to your mamma or papa? A. No, sir. Q. Did you sit on his lap down there? A. Yes, sir. Q. Is that all? A. Yes, sir. Q. He didn't do anything naughty down there? A. No, sir. Mr. Holbird: We object to the form of the question 'Anything naughty'. The Court: I believe you talked to Mrs. Whitt after she had taken you to the police station, you never had told anyone before that? A. No, sir. Q. She was a police officer and took you to the police station? A. Yes, sir. Q. And you told her all about it down there? A. Yes, sir. Q. Then you wrote these letters to Mr. Holbird that you just read, and you wrote the one to me that you

just read?  A. Yes, sir.  Q. You came down to the court-house this morning?  A. Yes, sir.  Q. Where did you go when you came down here?  A. To his office.  Q. Did he read the letters over to you?  A. No, sir.  Q. Did you read them?  A. No, sir.  Q. Did he talk to you about them? A. Yes, sir.  Q. You told *him* you wrote them because they were the truth, did you?  A. Yes, sir.  Q. Are they the truth?  A. Yes, sir.  Q. The letters are true, are they, is that right?  A. Yes, sir.  Mr. Kirkendall: That is all at this time, if the court please."

The letters referred to are two letters written by the prosecutrix, one to the county attorney, and one to the attorney for defendant, just prior to the trial.  These letters were almost identical, and are as follows:

"County Attorney:

"I will write you a few lines.  In regards of law suit between I and Uncle Ben Williams as Miss Whitt come out and got me and taken me up to her office and ask me things that I didn't know what she mint that Uncle Ben Williams always treated me meice.  He never done anything naughty to me that I was scart so that I thought I had to say yes everything that she said.  And I didn't know anything else to say or do.

"I didn't know what they took me to the doctor for.

"Yours Truly,
                    "[Signed]    Dorothy Lewis."

On re-direct examination she testified as follows:

"By Mr. Holbird: Q. Dorthy, do you know now why you wrote these letters?  Mr. Kirkendall: That is objected to as incompetent, irrelevant and immaterial, not proper rebuttal.  The Court: Overruled.  Mr. Kirkendall: Exception.  A. Because I didn't want to come up here.  Q. The questions you answered here awhile ago when you told these gentlemen that you didn't mean that, that is the truth, isn't it.  Mr. Kirkendall: That is objected to as incompetent, irrelevant and immaterial and argumentative, and leading.  The Court: Don't lead the witness.  Q. Dorthy, you say in the letter you didn't know what you went to the doctor for, is that the woman doctor or the other

doctor? Mr. Kirkendall: That is objected to as incompetent, irrelevant and immaterial. Q. Dr. Rude is the lady doctor. Mr. Kirkendall: If the Court please, we ask that counsel quit answering for the witness. Mr. Conway: This is our witness and we have a right to examine her. Mr. Kirkendall: We object to the remarks of the county attorney. Q. Now, Dorthy, I will ask you if you did go with Mr. Williams to a man by the name of Dr. Wigner? A. Yes, sir. Q. You saw his wife there, too, did you? A. Yes, sir. Q. Do you remember then, did you, also, go to a lady? A. Yes, sir. Q. The lady, where was her office? A. Up to the Broadway Tower. Q. Mrs. Whitt went with you up there? A. Yes, sir. Mr. Holbird: I believe that is all. Mr. Kirkendall: That is all, but I want to reserve the right to recall her for further cross-examination. The Court: Very well."

Without the testimony of the officers heretofore referred to, and the testimony of Dr. Wigner and his wife, there was no corroboration of prosecutrix' testimony except the testimony of Mrs. W. S. Whitt, who was at the time police matron of the city of Enid. She had made the preliminary examination which resulted in the arrest of defendant. She had conversed with the physician. She testified that while at the county jail after defendant's arrest she had a conversation with defendant in the presence of his wife. She did not warn defendant in any way that whatever he might say could be used against him. Her testimony as to this conversation was as follows:

"A. I went in the jail and he and his wife were sitting in the office of the county jail, Mr. and Mrs. Lewis are friends of mine, and as I approached them Mr. Williams got up, crying, we all cried, and I said 'Ben, what happened to you, what went wrong?' and he said, 'I guess we all go crazy sometimes,' and I said 'You are not the first one who has had weak moments, and you won't be the last one, if you were we would just take you out and shoot you,' and I sat down between him and his wife and we had a friendly conversation, not all of it pertaining to this case."

The evidence of Dr. Evelyn Rude, who examined the prosecutrix, Dorthy Lewis, on direct examination, was as follows:

"Q. I will ask you if during the month of August, 1937, you examined this little girl by the name of Dorthy Lewis? A. Yes, sir. Q. Doctor, what was the purpose of your examination? A. To determine the condition of the hymen. Q. To determine the condition of the hymen? A. Yes, sir. Q. Do you know for what purpose you were to determine that? A. Yes, sir. Q. For what purpose was it, why was that fact sought? A. To see if there had been any penetration. Q. To see if there had been any penetration of a sexual nature? A. Yes, sir. Q. Did you examine Dorthy Lewis' hymen? A. Yes, sir. Q. Will you explain, very briefly, to these gentlemen what the hymen is, whether a membrane, or what it is? A. The hymen is a small membrane at the entrance of the vagina between the libia minora and the vagina and ordinarily will admit one finger in the opening, the opening is the avenue into the vagina and will ordinarily admit one finger, but that would vary. Q. How close would you say that is to the opening, or to the libia, or outside of the vagina proper? A. It is a half to one inch inside the vagina or below the libia minora. Q. What was the condition of that hymen or the aperture into the hymen? A. It was sufficiently large to admit two fingers without any discomfort to the child. Q. Would you tell the jury about what that would be? A. My fingers are rather small. Ordinarily I allow for about three of my fingers to make what is ordinarily called two fingers by medical physicians or the medical profession. Q. That is ordinarily an examination to determine chastity, is it not, by the fingers? A. Not necessarily. Q. It is one way, is it? A. Yes, sir. Q. You say this hymen was distended until it would contain without pain to the patient two of your fingers or three, did you say? A. Easily two. Q. Would you say two of an ordinary person's fingers? A. Yes, sir. Q. Without pain to the patient? A. Yes, sir. Q. Let me inquire, Dr. Rude, if the opening, or size of it, was it more than a normal opening? A. Yes, sir, more than normal for a virgin. Q. Let me ask you if that could have been caused by the penetration of a normal male organ? A. Yes, sir. Q. It could have been? A. Yes, sir."

On cross-examination she testified as follows:

"Q. Dr. Rude, you are a lady, what is your weight? A. About 110 pounds. Q. Your fingers are of the ordinary size for a lady of that size? A. Yes, sir. Q. You say the hymen was stretched? A. Yes, sir. Q. It wasn't ruptured, was it? A. It had not been recently ruptured, but it was so large it was hard to tell. Q. In the report you made to the police officers, it was stated as just stretched, wasn't it? A. Yes, sir. Q. You didn't find a rupture or torn condition of the hymen, did you? A. She didn't have very much of a hymen—it is sometimes hard to tell whether it has been just stretched or whether torn. Q. You did report that it was just stretched, didn't you? A. Yes, sir."

The defendant, as a witness in his own behalf, testified he was 50 years of age; that he had been married 11 years to the sister of prosecutrix; that he and his wife and her parents had agreed that he should employ her sister during vacation time. This for the reason that she needed funds to help support the family. He denied that he at any time had ever had any illicit relation with the prosecutrix. His testimony was that the work was finished every afternoon and he was back home prior to 6 o'clock. That the only time he had ever taken her to Hellums Dam was when his wife went along and they were looking for a place to have a picnic for both families. His wife, as a witness, also testified to this same state of facts. He testified that he took her to Dr. Wigner's office on the 3rd day of August, 1936. He gave as a reason for doing so that she had told him about relations she had with some other boys in the community, and he wanted to have her examined so that she could be ready for school. That she gave the boy's name as "Clarence," and that there was a boy in the neighborhood by that name. This conversation with her was brought about by her father teasing her about "Clarence," and he thought "it was getting out of line a little, and I asked her about Clarence and she admitted to me she had been with him." She at this time told him

about missing her menstruation. He denied telling the chief of police or Mr. Moore that he had sexual intercourse with prosecutrix.

Four or five witnesses were offered by defendant who testified to his good character and reputation.

From what has been stated it will be noted that the evidence in this case is very unsatisfactory and contradictory. Not only the evidence of the prosecuting witness but the other evidence in the case reveals that every effort possible was brought to bear to secure a statement from defendant that would tend to corroborate the evidence of the prosecutrix, which was itself unsatisfactory. An examination of the entire record reveals that almost every objection of the county attorney was sustained and those of the defendant were overruled.

After the state had closed its case defendant asked for permission to recall the father of the prosecutrix for cross-examination. The purpose was to show that the clothing worn by prosecutrix had been washed, and that there was no blood on them and they were in order. The objection of the county attorney for permission to further cross-examine this witness was sustained because the state had closed its case. This, however, was before defendant had made his statement to the jury. This was a matter that was in the sound discretion of the trial court, and we do not hold the same was error, yet we can see no good reason why this request was denied under the circumstances of this case.

We have examined the instructions, and the requested instructions, and while counsel for defendant did not offer a requested instruction, we see no reason why the court should not have instructed the jury with reference to voluntary and involuntary confessions, so that the jury might have distinguished whether or not the statements made by the defendant were voluntary or involuntary. Berry v.

State, 4 Okla. Cr. 202, 111 P. 676, 31 L.R.A., N. S., 849; Kearns v. State, 14 Okla. Cr. 142, 168 P. 242; Mays v. State, 19 Okla. Cr. 102, 197 P. 1064. In the last case it is said:

"After a confession has been admitted, the defendant is entitled to have the evidence in regard to the manner in which it was obtained given anew to the jury, not that the jury may pass upon its admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence; and the jury may disregard it if they are not satisfied that it is voluntary."

In that case, the court instructed the jury as to voluntary and involuntary confessions, and instructed the jury if they found that the confessions which had been permitted to be introduced were not made freely and voluntarily, they should not be considered by the jury, and that it was the province of the jury to say whether or not the confessions were voluntary.

After carefully reading and considering the whole record in this case, we cannot but come to the conclusion that this defendant did not have that fair and impartial trial to which he was entitled under the law. McDonald v. State, 61 Okla. Cr. 287, 67 P. 2d 806; Workman v. State, 62 Okla. Cr. 81, 70 P. 2d 133; Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083. The case might not be reversed on one point, but one cannot read this record and believe that justice has been done by a verdict of 30 years in the penitentiary for this defendant, and for the reasons above stated we are of the opinion that this case should be reversed, and as the record discloses that the defendant is now confined at the state penitentiary at McAlester, the warden of that institution is directed to deliver defendant to the sheriff of Garfield county, and if the county attorney is of the opinion that he has evidence sufficient to convict the defendant in another trial of this cause, that

356

the same be set for trial, otherwise, the defendant should be discharged.

DOYLE, P. J., and DAVENPORT, J., concur.